(Decided 26th March, 1878.)

## THE MAYOR AND CITY COUNCIL OF BALTIMORE *vs.* JAMES MUSGRAVE.

*Right of a Municipal corporation to Abandon a contemplated Improvement—No right of Action against the Corporation for such Abandonment merely—Where owner of property is entitled to redress for Loss or damage suffered—One dealing with the Agents of a Municipal corporation, to take notice, at his peril, of the Limits of their powers—Rule of interpretation as to Instruments creating Agencies between private individuals—How powers of Agent to be exercised—*

*Distinction between the acts of an Officer or agent of a Munici-*
*pal corporation, and those of an Agent for a private indi-*
*vidual—When the Government or other Public authority is*
*bound by the acts of its Agent—Where a Municipal corpo-*
*ration is not responsible for the consequences of the acts of*
*its Agents—When the owner of property condemned for*
*Public improvement in a City, is not bound to obey a Notice*
*to surrender his property, given by the Agents of the Munici-*
*pal corporation—When a Municipal government can take*
*possession of property Condemned for public Improvement—*
*When Delay in abandoning a contemplated Improvement,*
*not such as to give the Owner of property Condemned, a*
*cause of action on that ground.*

A municipal corporation has the right to abandon any contemplated improve-
ment and repeal at its pleasure any ordinance providing for the same, and
after such abandonment property owners cannot compel the corporation to
take and pay for property condemned for such purpose; nor does any action
lie against the corporation for such abandonment merely.

But where the owner of property has suffered loss or damage by the acts or
delay of the corporation in any such case, he is entitled to redress for the
same.

One who contracts or deals with the agents or officers of a municipal corpora-
tion, must at his peril take notice of the limits of their powers.

It is a rule of interpretation universally applied to instruments, whether
formal or informal, creating agencies between private individuals, that
language, however general in its form, when used in connection with a
particular subject-matter will be presumed to be used in subordination to
that matter, and is therefore to be construed and limited accordingly.

It is also a universal principle of the law of agency that the powers of the
agent are to be exercised for the benefit of the principal only, and not of the
agent or third parties.

There is a broad distinction between the acts of an officer or agent of a public
municipal corporation and those of an agent for a private individual. In
cases of public agents the government or other public authority is not
bound, unless it manifestly appears that the agent is acting within the scope
of his authority, or he is held out as having authority to do the act, or is

Mayor, &c. of Balto. *vs.* Musgrave.

employed in his capacity as a public agent to make the declaration or representation for the government.

The Board of Commissioners for the improvement of Jones' Falls, appointed under an ordinance of the City of Baltimore, notified the owner of a tannery on Jones' Falls, on or about the 6th of January, 1873, that they had condemned his property, which was needed for the contemplated improvement, and would require possession of it at the earliest moment, and that he must so regulate his business as to bring it to a close. In consequence of this notice or request which was never countermanded, the property owner commenced closing out his business which he would otherwise have prosecuted as usual, and in thus closing out he did about half work for six months, and no work at all for about a year afterwards until the latter part of April, 1874, when he made up his mind the improvement would not go on, and at once commenced making arrangements for resuming his work. Subsequently the ordinance by which the improvement was authorized was repealed, and the improvement was abandoned by the city. In an action against the city of Baltimore by the property owner to recover for the loss and damage occasioned by this suspension of his business, it was HELD:

1st. That the Commissioners in notifying the plaintiff to close out his business and prepare to deliver possession of his property exceeded the authority conferred upon them, and the city was not responsible for the damages which resulted to the plaintiff from his voluntary acquiescence in such notice.

2nd. That the plaintiff could not be deprived of the use or possession of his property until he had been paid for it or had been tendered the sum ascertained by the Commissioners, or by a jury on appeal, and he was not bound to obey any notice to quit or close out his business, given by the Commissioners before such payment or tender had been made.

3rd. That upon such payment or tender the city could immediately take possession and oust the owner, no matter what might be the condition of his property, or the state of his business.

The notice to the plaintiff was given on or about the 6th of January, 1873, before any formal condemnation of the property had been made. That condemnation and the fixing of the value of the property by the Commissioners was not completed until the 15th of the following August. The plaintiff acquiesced in the assessment made by the Commissioners, but other parties appealed, and all of these appeals had not been finally disposed of before the ordinance was repealed. HELD:

That there was no such unauthorized delay on the part of the city in abandoning the work as would give the plaintiff a cause of action on that ground.

APPEAL from the Superior Court of Baltimore City.

This action was brought by the appellee, the owner of a tannery on Jones' Falls, in the City of Baltimore, to recover from the appellant for the loss and damage occasioned by the suspension of his business under circumstances set out in the opinion of the Court.

*Exception.*—The evidence on both sides being closed, the plaintiff offered the following prayer, which the Court (DOBBIN, J.,) granted:

If the jury shall find that the property of the plaintiff on Front street was within the lines of the Jones' Falls improvement, as laid down, provided for, or contemplated in the Ordinance of 1872, No. 51, and that the proceedings of the Commissioners, under said ordinance, were had, as appears by the record thereof, and as proven and admitted; and shall further find that the Commissioners in good faith notified the plaintiff on the 6th of January, 1873, that they had condemned his said property under the said ordinance, and would require possession thereof as early as possible, for the prosecution of said improvement, and for the purposes thereof, and notified and requested the plaintiff on said 6th of January, in view of the nature of his business as a tanner, to regulate his said business so as to be able to deliver up the said property to them, for the purposes aforesaid, as soon as possible; and that one of said Commissioners afterwards repeated and urged such request on the plaintiff, as testified to by Mr. Adams, and the plaintiff and his son, Thos. H. Musgrave, and never modified or revoked said notice or request at any time, nor was the same ever modified or revoked by the defendant. And if the jury shall find that the plaintiff, in consequence of and relying upon the premises, and upon said notice and request, and for the purpose of being able to give up said property to the Commissioners when required, did in good faith so regulate and contract his business as speedily as he reasonably could, and finally

suspend the same until April 21st, 1874, and that said Ordinance of 1872, was not repealed until May 27th, 1874, then the plaintiff is entitled to recover damages to the amount to which the jury may find that he was injured in and prevented from earning the ordinary and usual profits of his business, by reason of the reduction and suspension thereof aforesaid, together with the loss, if any, which he may have suffered by reason of the deterioration or destruction of his tanning liquors, which has been given in evidence.

The defendant offered four prayers, which need not be set out. These prayers the Court rejected. The defendant moved to exclude certain evidence which the Court had allowed to be given subject to exception, but the Court refused to exclude such evidence. To the action of the Court in granting the plaintiff's prayer, and its refusal to grant the defendant's prayers, and to exclude the evidence admitted subject to exception, the defendant excepted; and the verdict and judgment for $12,172.39, being for the plaintiff, the defendant appealed.

The cause was argued before BARTOL, C. J., MILLER, ALVEY and ROBINSON, J.

*James A. Buchanan*, for the appellant.

The Court below erred in granting the plaintiff's prayer. Every hypothesis of the prayer might have been found by the jury to be sustained by the evidence in the cause, and yet the plaintiff was not entitled to recover in this action, as there was no proof whatever that there was any unnecessary delay in the condemnation proceedings for the then contemplated Jones' Falls improvement, and in the absence of such proof the appellee could not recover. *Baltimore and Susquehanna R. R. Co. vs. Nesbitt,* 10 *Howard,* 395; *Graff vs. Mayor & C. C. of Balt.,* 10 *Md.,* 544; *State, ex rel. McClellan vs. Graves,* 19 *Md.,* 351;

*Merrick, Adm'r of Warfield vs. M. & C. C. of Balt.*, 43 *Md.*, 219 ; *Norris, et al. vs. M. & C. C. of Balt.*, 44 *Md.*, 598.

An examination of the laws and ordinances under which said condemnations were originally instituted, and finally abandoned, together with the evidence in the record, will satisfy the Court that there was no unnecessary delay on the part of the appellant or its officers in carrying on or abandoning said condemnation proceedings for the Jones' Falls improvement.

Said proceedings were instituted under an ordinance passed and approved April 24th, 1872. (See *Ordinances of* 1872, *No.* 51, *pages* 57-70.) This ordinance was supplementary to the ordinance of 1870, approved January 31st, 1870. (See *Ordinances of* 1870, *No.* 12, *pages* 27 *and* 29.)

Said ordinances were passed under the authority conferred upon the city by the Acts of 1870, chapters 113 and 115. See *Supplement to Baltimore City Code,* 1869–1874, *pages* 148–151.

Both of said ordinances were repealed by the subsequent Ordinance of 1874, No. 40, approved May 27th, 1874. (See *Ordinances of* 1874, *page* 55.) And said repeal is legal and binding. *Merrick, Adm'r vs. Mayor, &c., of Baltimore,* 43 *Md.,* 232, 233, 245 *and* 246 ; *Norris, et al. vs. Mayor, &c. of Baltimore,* 44 *Md* , 598 ; *Hampton vs. Commonwealth,* 19 *Penn.,* 329.

The prayer of the appellee is further objectionable, because even if the jury found from the evidence in the cause that the Commissioners for the improvement of Jones' Falls, gave the notices and did the acts therein stated, and that the appellee was injured because of what he did in pursuance thereof, still he was not entitled to recover in this action, as the notices so given by the Commissioners were clearly *ultra vires.* See 1 *Dillon on Mun. Corps.,* 471, *sec.* 381 ; 2 *Dillon on Mun. Corps.,* 854, *sec.*

749, *and* 877, *secs.* 766, 767, 768; *Mayor, &c. of Albany vs. Cunliff*, 2 *Comstock*, 165; *Anthony vs. Adams*, 1 *Metcalf*, 384; *Cugler vs. Rochester*, 12 *Wendell*, 165; *Mayor, &c., of Baltimore vs. Eschbach*, 18 *Md.*, 276; *Mayor, &c., of Balt. vs. Porter*, 18 *Md.*, 284; *State, ex rel. Mayor, &c., of Balt. vs. Kirkley, et al.*, 29 *Md.*, 85, 86; *Reynolds vs. Mayor, &c., of Balt.*, 20 *Md.*, 1.

If the notices given by the Commissioners were *ultra vires*, no subsequent ratification thereof by the Mayor and City Council could give them validity. *Horn vs. Mayor, &c., of Baltimore*, 30 *Md.*, 218, 219.

And if the action of the Jones' Falls Commissioners in giving the notices mentioned in appellee's prayer was *ultra vires*, the appellee in obeying the same, acted under a mistake of law, and is not entitled to recover any damages he sustained in consequence of obeying such notice. *Mayor, &c., of Balt. vs. Lefferman*, 4 *Gill*, 425; *Norris vs. Mayor, &c., of Balt.*, 5 *Gill*, 244; *Lester vs. Mayor, &c., of Balt.*, 29 *Md.*, 415, 419.

And the prayer of the plaintiff is further objectionable, because the rule of estimating the damages which he was entitled to recover, as therein stated, is not correct, and under said instruction, the jury could award the plaintiff remote and speculative damages. Such an instruction was calculated to, and doubtless did, mislead the jury. It is submitted, that in this case the appellee had no right to recover for the loss of the profits of his business. *Pierce on American Railroads*, 187; 10 *Cushing*, 385; 16 *Barbour*, 100, 105, 106 *and* 273; *The Tide Water Canal Co., vs. Archer*, 9 *Gill & John.*, 533, 534; *King vs. London Dock Company*, 5 *Adol. & Ellis*, 163; *Abbott vs. Gatch*, 13 *Md.*, 314.

*W. Hall Harris* and *S. Teackle Wallis*, for the appellee,

It is the well established law of this Court that the city has a right to abandon any contemplated improve-

ment, and repeal at its pleasure any ordinances providing for the same. *Graff vs. Mayor, &c. of Balt.*, 10 *Md.*, 544; *State vs. Graves*, 19 *Md.*, 351; *Norris vs. Mayor, &c. of Balt.*, 44 *Md.*, 606.

There is, consequently, no room for dispute as to the correctness of the general doctrine set forth in the appellant's third prayer, that no action lies against the appellant for the mere abandonment of the Jones' Falls improvememt.

It is, however, equally well established by the same decisions, that when the owner of property has suffered loss in any such case by the acts or delay of the city corporation, he is entitled to redress for the same. *Norris vs. Mayor, &c. of Balt.*, 44 *Md.*, 606.

That there was great loss to the appellee from the acts of the corporation and its agents in the present case, is not denied. That it was incurred in perfectly good faith, and from a conviction of duty and necessity, is equally indisputable. The only question is, whether it was incurred under circumstances which fix a liability for it on the city.

The Act of 1870, ch. 113, authorized the city to issue bonds to an amount not exceeding $2,500,000 for the construction of the works connected with the improvement of Jones' Falls, provided for by Ordinance No. 13, of January 31st, 1870, the bonds to be issued as provided in Ordinance No. 12 of the same date, (*Supplement to City Code, p.* 163,) when the latter should be approved by the people. The latter ordinance authorized the proceeds of the bonds to be applied in accordance with the preceding ordinance, *or any supplement thereto*, and was itself approved by the people in due course.

The Act of 1870, ch. 115, conferred upon the city the broadest possible powers for the improvement of the Falls, according to any plan or plans which had been or might be adopted. Its third section gave special power " to

define and locate the limits of Jones' Falls within the city of Baltimore,'' and to condemn and acquire property, &c., &c., with all the usual machinery of assessments, &c. By sec. 7, the existing Ordinance No. 13, of January 31st, 1870, was confirmed in all particulars. That ordinance, however, was not put into successful operation, and the supplementary Ordinance (No. 51) was passed on the 24th of April, 1872, under which the present controversy arises.

Its 7th section conferred the largest powers on the Commissioners.

By sec. 12 they were empowered to establish and define the line of the proposed improvement from Eager street to the basin, and make plats and drawings, the courses and lines, however, being generally prescribed in the same section, and the Commissioners being required to conform thereto as nearly as possible.

The property of Musgrave lies within the limits and lines prescribed by the ordinance, as shown by the proof, which also shows, that the Commissioners conformed their plats to those lines and limits, and included his property within the same.

The establishment and definition of these lines by the ordinance itself, in execution of the power conferred by sect. 3 of the Act of 1870, ch. 115, and their further adoption and definition by the Commissioners, were notice to him of the purpose of the city to condemn and take his property, and gave him the right to believe that it would be so condemned and taken, whether he consented or not. The Commissioners were clothed by the 7th section of the ordinance with the exclusive right to determine what was necessary or proper to carry out the plans and accomplish the improvement. They were authorized to control the execution of the plans as they saw fit, and every citizen had not only the right, but was bound to give respect and weight to their official acts. When they notified Musgrave

that they needed and would take his property, (of which indeed he was already notified, by its location within the limits defined in the ordinance,) neither they nor he had any right to presume or suppose that the ordinance would be repealed. Both were bound to believe that it would be executed, and it was their duty to act accordingly. The notice given to Musgrave was a prudent and proper notice, rendered especially so by the nature of his business. If he had disregarded it and had gone on with his work, thereby augmenting his loss at his own risk, he could not justly have called on the city to compensate him for it if the work had been completed, nor could he have justified himself in incurring such risk, by alleging the possibility of the repeal of the ordinance as a good ground for refusing to comply with the request of the Commissioners. That request was in the course of the duty of the Commissioners and within the scope of their powers. It was given and accepted in good faith, as showed by the evidence, and with a laudable view to the interests of the city and the citizen alike. As soon as Musgrave saw that there was an indication of the failure of the improvement, he resumed work, to save both the city and himself. He made no complaint of the assessment and no opposition to the consummation of the work, and the Mayor and City Council had no power, by repealing the ordinance for their own benefit, to throw on him the damage of a sacrifice which he had made for their advantage, and at the request and urgency of their own authorized agents. *Baron vs. Mayor, &c. of Balt.*, 2 *American Jurist*, 210 ; *Stetson vs. Faxon*, 19 *Pickering*, 158 ; *Goodall vs. The City of Milwaukee, et al.*, 5 *Wisconsin*, 43 ; *Thayer vs. Boston*, 19 *Pickering*, 515, 516; *Leverich vs. Mayor, &c. of New York*, 66 *Barbour*, 623.

[The argument of Counsel on other points, it is not deemed necessary to report.—REPORTER.]

MILLER, J., delivered the opinion of the Court.

A municipal corporation has the right to abandon any contemplated improvement, and repeal at its pleasure any ordinance providing for the same, and after such abandonment, property owners cannot compel the corporation to take and pay for property condemned for such purpose, nor does any action lie against the corporation for such abandonment merely. These propositions have been settled by many decisions of this Court. *Graff vs. Mayor, &c.*, 10 *Md.*, 544; *McClellan vs. Graves*, 19 *Md.*, 351; *Norris vs. Mayor, &c.*, 44 *Md.*, 606. But the same authorities hold, that where the owner of property has suffered loss or damage by the acts or delay of the corporation in any such case, he is entitled to redress for the same, and that is the foundation of the action in the present case.

The plaintiff is the owner of a tannery on Jones' Falls, in the City of Baltimore, located between Front street and the stream, and between Gay and Hillen streets, and this establishment was within the lines prescribed for the improvement of Jones' Falls, by the 12th section of the ordinance on that subject of the 24th of April, 1872, and the record shows that on or about the 6th of January, 1873, the Commissioners appointed under that ordinance came to his establishment with their clerk and janitor, and exhibited to him a map or drawing of the improvement, including his premises, and notified him that they had condemned his property and would require possession of it at the earliest moment, as it was within that part of the section comprising it on which they desired to begin their work. They also further notified him that as from the nature of the tanning business, it would take him some time to work up his stock and close up his business so as to be able to give possession of his property to the city, he must so regulate his business as to bring it to a close at the earliest moment, and take in no new stock of

bark or hides, but content himself with working out what he had on hand at the time, and one of the Commissioners from time to time afterwards urged the same thing upon him. This request or notice was given, accepted and complied with in good faith, and was never countermanded. In consequence of it, and for no other reason, he at once commenced closing out his business, which he would otherwise have prosecuted as usual, and in thus closing out he did about half work for six months, and no work at all for about a year afterwards until the latter part of April, 1874, when he made up his mind the improvement would not go on, and at once commenced making arrangements for procuring bark and resuming his work. It is for the loss and damage occasioned by this suspension of his business, that he now sues, and it is obvious that his right to recover depends entirely upon the question whether it was within the scope of the authority vested in these Commissioners to give the notice and make the demand or request referred to ; for it is very clearly settled that one who contracts or deals with the agents or officers of a municipal corporation, must *at his peril* take notice of the limits of their powers. *Mayor, &c. vs. Eschbach*, 18 *Md.*, 276 ; *Mayor, &c. vs. Reynolds*, 20 *Md.*, 1 ; *Mayor, &c. vs. Kirkley*, 29 *Md.*, 85 ; *Horn vs. Mayor, &c.*, 30 *Md.*, 218. We must therefore examine the laws and ordinances relating to this improvement, and determine the extent of the powers and authority thereby vested in these Commissioners.

After the great destruction of property in that vicinity occasioned by the flood of 1868, efforts were made to have the channel .of this stream flowing through the city, so changed, widened, straightened and improved, as to prevent the recurrence of similar disasters. A plan for this improvement was made by Mr. Tyson, which was adopted by the Mayor and City Council, and Ordinance No. 13, of 1870, approved January 31st of that year, was passed, appointing three named Commissioners to carry it into

effect. By Ordinance No. 12, approved on the same day, provision was made for the issue of bonds of the city, not exceeding $2,500,000, the proceeds of which were to be used in the construction of this improvement and for no other purpose. It was also provided that this ordinance should be submitted to a vote of the people for their approval or rejection, after the General Assembly should have passed a law authorizing the issue of such bonds. The Legislature, by the Act of 1870, ch. 113, approved March 23rd, 1870, authorized the Mayor and City Council to issue bonds not exceeding $2,500,000 for this purpose, provided Ordinance No. 12 above mentioned should be approved by the votes of a majority of the legal voters of the city. By another Act, approved on the same day, (Act of 1870, ch. 115,) the Mayor and City Council were authorized and empowered to make such improvements in connection with Jones' Falls, as in their judgment are desirable, and for this purpose to change the course, lines, and boundaries of the stream in whole or in part, to lay out and construct streets, avenues, and wharves on the sides of and adjacent to the same, to widen and deepen the channel, to construct such sewers and drains as may be requisite, "and generally to do all such things, and exercise all such powers as in their judgment shall be necessary to be done and exercised, for the accomplishment of any plan or plans for the improvement of Jones' Falls, which have been or may be adopted by them." This law also gives them power to acquire property by condemnation, and ratifies all the provisions of Ordinance No. 13, above referred to, in the same manner, and to have the same effect as if that ordinance had been passed after the approval of this Act. The bond ordinance was subsequently approved by the popular vote, but nothing was done in prosecution of the work under Ordinance No. 13. In 1872 was passed Ordinance No. 51, approved April 24th, of that year, supplementary to Ordinance No. 13, of 1870,

and the Commissioners appointed under this supplementary ordinance proceeded in the discharge of their duties, and it was while acting under this ordinance that they gave the notice and made the demands respecting the plaintiff's property, which have resulted in the present suit. Its provisions we shall examine more at length, presently. It is conceded that while it was originally estimated the entire cost of this improvement would not exceed $2,500,000, yet the valuation of property alone to be taken for the work, amounted to nearly that sum, and it was then estimated that the additional sum of $1,500,000 would be required to complete it. An ordinance approved February 12th, 1874, providing for the issuing of bonds for this additional sum was submitted to the people for approval, but was rejected, and then by an ordinance approved May 27th, 1874, the ordinance of 1872 was repealed, and the improvement thereby authorized was abandoned.

Let us now examine this ordinance of 1872. It consists of twenty-two sections, and a general review of its main provisions is essential to an understanding of the powers it conferred upon the Commissioners. It provides first for the appointment of three persons to be styled the "Board of Commissioners for the Improvement of Jones' Falls," fixes their salaries, prescribes their oath of office, gives them power to appoint a clerk, who shall keep a full and true record of their proceedings, also a chief engineer, who shall act under their supervision, and discharge such duties as shall be prescribed by this ordinance or by the said Board, and by section *seven* it is enacted, "that the said Board of Commissioners shall have, and they are hereby vested with the general charge, superintendence and control of the execution of the plan for the improvement of Jones' Falls hereinafter mentioned and prescribed, and shall have all the powers necessary or proper to carry out said plan and accomplish the said improvement." The

Commissioners are then given full power and authority to make, award, and settle the terms of all contracts necessary for the construction of the works contemplated by this ordinance, and are authorized and directed to superintend the performance of the work by the contractors, and to annul their contracts if they fail faithfully and properly to perform them. Before awarding these contracts they are required to advertise for proposals and to award the same to the lowest competent and responsible bidder, and to so apportion them, as that the completion of the entire work shall be accomplished as soon as may be consistent with the proper execution of the same. All expenses of the Board in the discharge of their duties, including their salaries, and all payments due on the contracts awarded by them, and all payments for land damages, are to be paid by the City Register upon the warrant of the Comptroller, who shall issue his warrant therefor upon the production to him of orders specifying the amounts respectively due, signed by the Board or a majority of them, and the Commissioners shall present to the Mayor and City Council quarterly reports giving detailed accounts of their proceedings and expenditures. By section *twelve* it was made their duty without delay, under the advice of their chief engineer, to establish and define the lines of the improvement from Eager street to the Basin, to determine the heights and widths of the new walls, the depth of the excavations to be made, and to adopt detailed specifications of the entire work, *provided* the width of the new channel between certain described points shall be according to certain specified details, and *provided* further, that in establishing the lines, and obtaining the width, and adopting the details aforesaid, the Commissioners shall be governed by, and as nearly as possible conform to, certain general directions which the section specially prescribes. When these locations are thus made and these lines are thus established, they shall have made an

accurate copy of the plat or drawings of the lines, and file the same in the office of the City Commissioner, and the same shall be known and recognized, after all rights of property within the same shall have been acquired by the city, as the lines and boundaries of Jones' Falls. It is then made their duty to have erected certain described bridges, for which they are to award contracts in the same manner as for the construction of other parts of the work, also to provide in the same manner for the construction of sewers, and to make such changes in the grades of streets as may be necessary for the proper construction of the works hereinbefore provided for. They are then directed to have made such additional plats and surveys as may be requisite for the ascertainment of the damages consequent upon the condemnation or acquisition of property necessary to be acquired by the city in the location of these new lines, or may be damaged thereby; and they shall then proceed to ascertain what actual damage will be caused to the owners of such property, and in making this estimate of damages they shall take into consideration the benefits, if any, which in their judgment will accrue to such owners, and if in any case part of a lot or house only is required and the owner shall claim compensation for the whole, they shall ascertain the value of the whole, and sell what is not needed. After completion of this valuation, including the value of all property necessary to be acquired by the city for the construction of these works, they shall cause statements thereof to be made, which in connection with an explanatory map, shall contain a correct description of each parcel of property to be taken, and the amount of damages awarded by them to each owner. They shall then give notice by publication that such statements have been prepared and are ready for examination by parties interested, and that they will meet to review their several ascertainments of damages to which any interested party may file written exceptions; and on the hearing of

such exceptions, they shall take testimony and make such corrections in their estimates as to them shall appear just and proper. After such corrections have been made, they shall cause these statements and maps to be copied, certified and deposited in the office of the City Register, and shall then give notice of the right of appeal. Provision is then made for such appeals to the City Court, and for a jury trial. In cases where no appeal is taken the assessments of the Commissioners are made conclusive. Finally, upon payment or tender of the sums so ascertained by the Commissioners, or by the Court on appeal, to the parties entitled, or upon the investment thereof in five per cent. City Stock, such property shall become the property of the city for the purposes aforesaid.

Such are the powers conferred on these Commissioners; and such are the duties they were required by this ordinance to perform. It cannot be successfully contended that the ordinance itself is in any respect in excess of the powers granted to the city by the Act of 1870, ch. 115. But does the ordinance give these Commissioners the authority to notify a property owner before his property is actually paid for under the condemnation, to close out his business and prepare to deliver possession, so as to bind the city for any loss accruing to him by reason of his obeying such notice and demand? The authority to do so is rested mainly upon the general terms of section *seven,* by which the Commissioners are vested with the general charge, superintendence and control of the execution of the plan for the improvement hereinbefore mentioned and prescribed, and which declares they shall have "all the powers necessary and proper to carry out said plan and accomplish the said improvement." The terms here employed, it must be admitted, are very broad and general, but it must be remembered that language, however general in its form, when used in connection with a particular subject-matter, will be presumed to be used in subordination to that matter,

and is therefore to be construed and limited accordingly. This is the rule of interpretation that is universally applied to instruments, whether formal or informal, creating agencies between private individuals. *Story on Agency, secs.* 21, 62, 68, 69. It is also a universal principle of the law of agency that the powers of the agent are to be exercised for the benefit of the principal only, and not of the agent or third parties. Hence a power in the most general terms to draw and endorse bills for, and in the name of the principal, will not authorize a drawing or endorsing in his name for the accommodation of third persons, or for the benefit of the agent. *Adams Express Co. vs. Trego*, 35 *Md.*, 67. It must also be noted that there is a broad distinction between the acts of an officer or agent of a public municipal corporation, and those of an agent for a private individual. In cases of public agents the Government or other public authority is not bound unless it *manifestly appears* that the agent is acting *within the scope of his authority*, or he is held out as having authority to do the act, or is employed in his capacity as a public agent to make the declaration or representation for the Government. *Story on Agency, sec.* 307 *a.* This rule was adopted and applied by this Court in the cases of *Mayor vs. Eschbach* and *Mayor vs. Reynolds*, and the reasons for it stated. These are founded in public policy, and the rule indeed seems indispensable "in order to guard the public against losses and injuries arising from the fraud, or mistake, or rashness and indiscretion of their agents." In the case before us there is an entire absence of even a pretence of fraud or collusion, and it is conceded the Commissioners, as well as the plaintiff, acted with the utmost good faith, but this cannot affect the principle on which the rule is founded, or prevent its application. Our predecessors have adopted, in *Reynolds' Case*, the language of the Supreme Court in *Lee vs. Munroe*, 7 *Cranch*, 370, where it is said "it is better that an individual should now and

then suffer by such mistakes, than to introduce a rule, against an *abuse of which,* by improper collusions, it would be very difficult for the public to protect itself.''

In the light of these well settled principles and rules of construction, we are unable to say that the authority insisted on is conveyed by the general language of this section. The mode of condemning property and of assessing and settling the damages are specially pointed out, and the duties of the Commissioners in that respect are plainly defined. We cannot suppose it was the intention of those who enacted this ordinance, that the Commissioners should have power to enter into any arrangements, or contracts with, or do any acts towards, property owners by which any other claim for damages could accrue to them than for the sums so to be ascertained and settled. Was it contemplated that every property owner, doing business in that locality, might have two sets of claims against the city, one for the value of his property ascertained by the condemnation, and the other for leaving it, or quitting his business upon preliminary notice, given by the Commissioners? It is clear beyond question, that no property owner could be deprived of the use or possession of his property, until he had been paid for it, or tendered the sum ascertained by the Commissioners, or by a jury on appeal, and it follows that he was not bound to obey any notice to quit or to close out his business, given by the Commissioners before such payment or tender had been made. It is equally clear, that upon such payment or tender, the city could immediately take possession and oust the owner, no matter what might be the condition of his property or the state of his business. A power therefore, the exercise of which would, so far as we can see, result in no practical benefit to the city, a power which could not be enforced, and need not be obeyed, we cannot regard as '' necessary or proper '' to carry out the plan and accomplish the improvement contemplated and provided for by this ordinance. No other

Mayor, &c. of Balto. *vs*. Musgrave.

part of the ordinance professes to grant any such power, and in our judgment, the Commissioners in giving this notice and making this demand, exceeded the authority conferred upon them, and the city is therefore not responsible for the damages which resulted to the plaintiff from his voluntary acquiescence therein. It follows there was error in granting the plaintiff's prayer.

It appears from the record, that the notice was given on the 6th of January, 1873, before any formal condemnation of the property had been made. That condemnation, and the fixing of the value of the property by the Commissioners, was not completed until the 15th of the following August. The plaintiff acquiesced in the assessment made by the Commissioners, but other parties appealed, and all of these appeals had not been finally disposed of, before the ordinance was repealed. There was, hence, no such unauthorized *delay* on the part of the city, in abandoning the work as would give the plaintiff a cause of action on that ground, within the doctrine settled in the case of *Norris vs. The Mayor.* Finding therefore in the record no ground upon which the action can be sustained, we shall reverse the judgment without awarding a new trial.

*Judgment reversed,*
*and new trial refused.*

(Decided 26th March, 1878.)