## PORTSMOUTH HARBOR LAND & HOTEL COMPANY ET AL. *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 97. Argued November 15, 1922.—Decided December 4, 1922.

1. The petition alleged that the United States, after having several times in the past discharged its battery over petitioner's land, reinstalled its guns with the intention of so firing them and without intention or ability to fire them otherwise, established a fire control and service upon that land, and again discharged all of the guns over and across it. A taking by the United States was alleged as a conclusion of fact from these specific acts, and damages were claimed. *Held*, that the taking of a servitude, and an implied contract to pay, might be inferred; and that a demurrer to the petition should not have been sustained. P. 328.
2. Where acts amount to a taking of property by the United States, without assertion of an adverse right, a contract to pay may be implied whether it was thought of or not. P. 330.

56 Ct. Clms. 494, reversed.

APPEAL from a judgment of the Court of Claims dismissing a petition on demurrer.

*Mr. Chauncey Hackett,* with whom *Mr. John Lowell* was on the briefs, for appellants.

*Mr. Solicitor General Beck,* with whom *Mr. Robert P. Reeder,* Special Assistant to the Attorney General, was on the brief, for the United States.

MR. JUSTICE HOLMES delivered the opinion of the Court.

This is a claim in respect of land which, or an interest in which, is alleged to have been taken by the United States Government. Similar claims in respect of the same land based upon earlier acts of the Government have been made before and have been denied. *Peabody* v. *United States,* 231 U. S. 530. *Portsmouth Harbor Land & Hotel Co.* v. *United States,* 250 U. S. 1. But it is urged that the cumulative effect of later acts added to those that have been held not enough to establish a taking leads to a different result.—The land is on Gerrish Island, lying east of the entrance to Portsmouth Harbor, and borders on the ocean. Its main value is for use as a summer resort. Adjoining it to the north and west lies land of the United States upon which the Government has erected a fort, the guns of which have a range over the whole sea front of the claimants' property. In the first case it was decided that the mere erection of the fort and the fact that guns were fired over the claimants' land upon two occasions about two years and a half before the suit was brought, coupled with the apprehension that the firing would be repeated, but with no proof of intent to repeat it other than the facts stated, did not require the finding of an appropriation and a promise to pay by the United States. The second case was like the first except for " some occasional subsequent acts of gun fire," 250 U. S. 2, and the finding of the Court of Claims for the United States again was sustained.

The present case was decided upon demurrer. The question therefore is not what inferences should be drawn from the facts that may be proved but whether the allega-

tions if proved would require or at least warrant a different finding from those previously reached. There is no doubt that a serious loss has been inflicted upon the claimant, as the public has been frightened off the premises by the imminence of the guns; and while it is decided that that and the previously existing elements of actual harm do not create a cause of action, it was assumed in the first decision that " if the Government had installed its battery, not simply as a means of defense in war, but with the purpose and effect of subordinating the strip of land between the battery and the sea to the right and privilege of the Government to fire projectiles directly across it for the purpose of practice or otherwise, whenever it saw fit, in time of peace, with the result of depriving the owner of its profitable use, the imposition of such a servitude would constitute an appropriation of property for which compensation should be made." 231 U. S. 538. That proposition we regard as clearly sound. The question is whether the petition before us presents the case supposed.

It is alleged that after dismounting the old guns for the purpose of sending them to France during the late war, the United States has set up heavy coast defense guns with the intention of firing them over the claimants' land and without the intent or ability to fire them except over that land. It also, according to the petition, has established upon that land a fire control station and service, and in December, 1920, it again discharged all of the guns over and across the same land. The last fact, although occurring after this petition was filed, may be considered as bearing on the intent in establishing the fire control. If the United States, with the admitted intent to fire across the claimants' land at will should fire a single shot or put a fire control upon the land, it well might be that the taking of a right would be complete. But even when the intent thus to make use of the claimants' property is not admitted, while a single act may not be enough, a continuance of them in sufficient number and for a sufficient

time may prove it. Every successive trespass adds to the force of the evidence. The establishment of a fire control is an indication of an abiding purpose. The fact that the evidence was not sufficient in 1905 does not show that it may not be sufficient in 1922. As we have said the intent and the overt acts are alleged as is also the conclusion that the United States has taken the land. That we take to be stated as a conclusion of fact and not of law, and as intended to allege the actual import of the foregoing acts. In our opinion the specific facts set forth would warrant a finding that a servitude has been imposed.

It very well may be that the claimants will be unable to establish authority on the part of those who did the acts to bind the Government by taking the land, *United States* v. *North American Transportation & Trading Co.*, 253 U. S. 330. But as the allegation is that the United States did the acts in question, we are not prepared to pronounce it impossible upon demurrer. As the United States built the fort and put in the guns and the men, there is a little natural unwillingness to find lack of authority to do the acts even if the possible legal consequences were unforeseen. If the acts amounted to a taking, without assertion of an adverse right, a contract would be implied whether it was thought of or not. The repetition of those acts through many years and the establishment of the fire control may be found to show an abiding purpose to fire when the United States sees fit, even if not frequently, or they may be explained as still only occasional torts. That is for the Court of Claims when the evidence is heard.

*Judgment reversed.*

MR. JUSTICE BRANDEIS dissenting, with whom MR. JUSTICE SUTHERLAND concurs.

I agree that, in time of peace, the United States has not the unlimited right to shoot from a battery over adjoining

private property, even if no physical damage is done to it thereby; that a single shot so fired may, in connection with other conceivable facts, justify a court in finding that the Government took, by eminent domain, the land or an easement therein; and that such taking, if made under circumstances which give rise to a contract implied in fact to pay compensation, will entitle the owner to sue in the Court of Claims. But the question here is not whether the facts set forth in the petition would alone, or in connection with other evidence, justify the court in finding such a taking and the implied contract. The case was heard on demurrer to the petition; the facts therein set forth must, therefore, be taken as the ultimate facts; and they must be treated as are the findings of fact made by the Court of Claims. These are treated like a special verdict and not as evidence from which inferences may be drawn. Rule I of this Court relating to appeals from the Court of Claims; *Crocker* v. *United States,* 240 U. S. 74, 78; *Brothers* v. *United States,* 250 U. S. 88, 93. Unless, therefore, the petition sets forth facts well pleaded, which if found by the lower court would as matter of law entitle the claimants to a judgment, the lower court was, in my opinion, right in dismissing the petition.

Appropriation by the United States of private property for public use, without instituting condemnation proceedings, does not entitle the owner to sue under the Tucker Act (Judicial Code, § 24, par. 20), unless the taking was made under such circumstances as to give rise to a contract express or implied in fact to pay compensation. *Hill* v. *United States,* 149 U. S. 593; *Schillinger* v. *United States,* 155 U. S. 163, 168–171; *Belknap* v. *Schild,* 161 U. S. 10, 17; *John Horstmann Co.* v. *United States,* 257 U. S. 138, 146. Hence this action must rest on a contract, express or implied in fact. *Harley* v. *United States,* 198 U. S. 229; *United States* v. *Buffalo Pitts Co.,* 234 U. S. 228, 232; *William Cramp & Sons Co.* v. *Curtis Turbine*

*Co.,* 246 U. S. 28, 40, 41.  There is no suggestion of an express promise; and there is not to be found in the petition, or in the exhibits incorporated by reference, a single allegation, however general, of an implied contract.  This omission would not be fatal, if the petition set forth the facts essential to the existence of the cause of action.  But it does not.  An appropriation of private property will not entitle the owner to recover if made by mistake or if made under a claim of right, although the claim is later shown to be unfounded.  *Tempel* v. *United States,* 248 U. S. 121, 130, 131.  And, if the appropriation was made by an officer without authority, the claimant is likewise without this remedy against the Government.  *United States* v. *North American Transportation & Trading Co.,* 253 U. S. 330, 333.  The essentials of a recovery are a taking on behalf of the United States, made by officials duly authorized, and under such conditions that a contract will be implied in fact.  The petition fails to set out such facts.  Indeed, the facts which are set out make it clear that what was done did not constitute a taking; that the officers of the Government in doing what they did, had no intention of subjecting it to any liability; that they were not authorized to take the land or an easement therein; and that they consistently denied that claimants were entitled to compensation.  Implied contracts in fact do not arise from denials and contentions of parties, but from their common understanding whereby mutual intent to contract without formal words therefor is shown.  *Farnham* v. *United States,* 240 U. S. 537; *E. W. Bliss Co.* v. *United States,* 253 U. S. 187, 190, 191; *Knapp* v. *United States,* 46 Ct. Clms. 601, 643.

The petition sets forth the proceedings in the two earlier cases, *Peabody* v. *United States,* 231 U. S. 530; *Portsmouth Harbor Land & Hotel Co.* v. *United States,* 250 U. S. 1.  Those judgments make *res judicata,* not only the fact that there was no appropriation prior to 1918, but

also the facts specifically found in the second suit concerning the erection and maintenance of the battery, the policy and practice of the military authorities, and their intentions when the guns were discharged prior to that date. Among other things, as the petition states, the court found that the shots were fired for the purpose of testing certain modifications of the gun carriages made shortly prior thereto; that in so firing the guns the officers and agents of the United States especially desired, intended, and took precautions so to fire them and believed they were so firing them, as to avoid firing any of them over any part of claimants' land; that such firing as was done over said land was due to a misunderstanding on the part of said officers and agents as to the boundaries of said land; that the fort was not constructed for the purpose of firing any of its guns over and across any of claimants' lands in time of peace, or of so firing them at all, except over the Government's own premises occasionally for testing purposes; that the fort was never garrisoned; that no target or practice firing was ever done there; that until 1917, when its guns were dismounted for removal and use elsewhere, its batteries had been continuously kept in serviceable condition for defensive use by a small detail from Fort Constitution, across the harbor; and that it was the policy and practice of the military authorities not to maintain garrisons and train gun crews at all of its coast fortifications, but to maintain garrisons and do such training at fortifications where the facilities for training are best and where there was, or naturally would be, less objection and complaint by nearby residents on account of the noise and concussion.[1] The only later occurrences,

---

[1] The facts concerning the establishment and earlier use of the battery found in the first suit, were:

By Act of February 21, 1873, c. 175, 17 Stat. 468, 469, Congress appropriated $50,000 for batteries in Portsmouth Harbor, on Gerrish Island and Jerry Point, and by Act of February 10, 1875, c. 39, 18

material to the issue, which are set forth in this suit, in the petition as amended, are the re-installation of the guns at the battery after the Armistice, the erection of a fire control station on claimants' land in connection therewith, and firing the guns on December 8, 1920.

This suit was begun in February, 1920. The original petition set forth the facts found in the earlier cases; and

Stat. 313, added to the appropriation for the Gerrish Island battery, $20,000. Under the authority thus conferred a tract of 70 acres abutting claimants' land was purchased in 1873, and construction was begun. After $50,000 had been expended in substantially completing the breast-high walls of the fortification, the work was suspended for lack of appropriations in 1876; and it was not resumed until funds were allotted out of the general appropriation made by the Act of May 7, 1898, c. 248, 30 Stat. 400, for fortifications and like purposes. Then, on the site of the old, uncompleted battery, there was constructed the battery now known as Fort Foster; and in December, 1901, it was transferred to the Artillery. In June, 1902, the Government fired two of the guns, and in September, 1902, another, for the purpose of testing guns and carriages, off the coast; and in so doing it fired across complainants' land. Between that time and 1911 no gun was fired from the fort. This battery is located within 200 feet of a corner of claimants' land; no part of the fort encroaches upon it; but the guns there installed had a range of fire over all its sea front; and whether the guns then installed could have been fired for practice or other necessary purpose in time of peace without shooting over claimants' land depends upon a question of law concerning ownership of a narrow strip of land over which the guns had a range of fire—a question as to which the parties were and so far as appears are still in dispute. It was not, so far as then appeared, the intention of the Government to fire in time of peace any gun already installed or which might thereafter be installed, over and across the claimants' land, so as to deprive them of the use of the same or to injure them, except as such intention can be drawn from the fact that the guns then installed were so fixed as to make it possible so to do and the fact that they had been fired as stated. On these facts found by the Court of Claims, 46 Ct. Clms. 39, that court and this held, that there was no basis for the claim that the Government had appropriated the land and impliedly agreed to pay for it. *Peabody v. United States,* 231 U. S. 530.

substantially nothing more except the intention to reinstall the guns. It was devoted largely to pointing out errors in the earlier findings for which it sought relief through the equity powers of the court. The only new fact then alleged, which may be deemed material, was " establishing [on claimants' land] a fire control station and service for use of the fort." The reinstallation of guns, and the firing in December, 1920, were first set up by an amendment filed in 1921. And it is by this reinstallation after the commencement of this suit, that the United States is alleged to have established the fort as a part of the permanent coast defense.[1] If there was no taking until the guns were installed and the shots fired in December, 1920, then there was no cause of action when this suit was brought; and the demurrer was properly sustained on that ground. See *Court of Marion County* v. *United States,* 53 Ct. Clms. 120, 150. And there is this further obstacle to the maintenance of the suit. We take judicial notice of the fact that on December 8, 1920, the United States was still at war with Germany and Austria-Hungary. Joint Resolution of March 3, 1921, c. 136, 41 Stat. 1359. That the Government has in time of war the right to shoot-over private land was assumed in *Peabody*

---

[1] The amendment alleges:.

"And in so doing the United States have established the said fort and battery with the said guns as a part of the permanent establishment of the coast defense fortifications maintained by [it] . . . without intending to fire, or being able to fire, the said guns to sea except over and across the said land. And the United States have used the said land of the said claimants for the establishment of a fire control station and service for the use of said fort. The United States have since setting up the said guns, as aforesaid, at frequent intervals in the use of the said fort, raised the said guns and pointed them as aforesaid over and across the said land, and have, further, in the use of the said fort, discharged all of the said guns as aforesaid, on or about the eighth day of December, 1920, over and across the said land."

v. *United States, supra,* and is not disputed.   See also, *Peabody* v. *United States,* 43 Ct. Clms. 5, 18.   The Armistice signed November 11, 1918, left the United States possessed in December, 1920, of the same power to fire over claimants' land as if war had then been flagrant. *Hamilton* v. *Kentucky Distilleries & Warehouse Co.,* 251 U. S. 146, 158–160.   Reinstallation of the guns and testing them by firing was an appropriate precautionary measure in view of a possible renewal of the conflict. Thus, the only overt acts upon claimants' land which are alleged to have occurred after the date of the findings in the earlier cases, and which are relied upon as establishing a taking after entry of the judgment in 250 U. S. 1, appear to have been acts done in the exercise of a right already possessed without a taking.

It is said that the petition alleges, in general terms, a taking and intention to take by the United States; that this allegation alone, although general, is an allegation of all the facts necessary to give a cause of action; and that the specification in detail of the facts relied upon may be treated as surplusage.   To this contention there are several answers.   The practice of the Court of Claims, while liberal, does not allow a general statement of claim in analogy to the common counts.   It requires a plain concise statement of the facts relied upon.   See Rule 15, Court of Claims.   The petition may not be so general as to leave the defendant in doubt as to what must be met. *Schierling* v. *United States,* 23 Ct. Clms. 361; *Atlantic Works* v. *United States,* 46 Ct. Clms. 57, 61; *New Jersey Foundry & Machine Co.* v. *United States,* 49 Ct. Clms. 235; *United States* v. *Stratton,* 88 Fed. 54, 59.   If the suit had rested upon a statute which provides that the owner of property appropriated shall receive compensation, a fairly general statement that the property had been taken might be sufficient; for, in such a case, the obligation to pay would follow as a conclusion of law.   But here, there

is no such statute; the mere fact of appropriation would not raise a promise implied in law; hence, claimants were obliged to set forth additional facts to show that the Government intended to pay the claimants compensation. Moreover, the general allegation of taking was not left to stand alone. Claimants set forth, in great detail, the facts upon which they rely as constituting a legal taking; they have done it in such a way that the allegation of taking reads now, not as an allegation of fact, but as a statement by the pleader of a conclusion of law; and consequently is not admitted by the demurrer. *Pierce Oil Corporation* v. *City of Hope*, 248 U. S. 498, 500. And for a further reason, the facts set forth in detail may not be disregarded as surplusage. They negative the existence of a cause of action. *Randall* v. *Howard*, 2 Black, 585; *McClure* v. *Township of Oxford*, 94 U. S. 429; *Speidel* v. *Henrici*, 120 U. S. 377. The facts stated show, as indicated above, not only an absence of taking and of intention to take the claimants' property, but also an absence of authority to do so in those who did the acts relied upon.

The petition alleges in terms authority in the Secretary of War to take the land. But in setting forth the facts relied upon, the pleader has disclosed the absence of authority from the Secretary of War to the officers by whom the taking, if any, must have been made. Claimants seek in their suit to recover $820,000. They assert that the land is worth $700,000. For the fifteen years preceding the commencement of this suit, there had been active litigation in which claimants had strenuously asserted that there was a taking and the United States had throughout denied that it had taken, or intended to take, any property of claimants. Unless the Secretary of War conferred upon his subordinates who made this alleged taking authority to take this land or an easement therein, the Government can, in no event, be made liable. *United States* v. *North American Transportation & Trading Co.,*

253 U. S. 330, 333, 334. See *Ball Engineering Co.* v. *J. G. White & Co.*, 250 U. S. 46, 54–57. If the present case had proceeded to a trial on the facts, claimants could not have proved authority in the subordinate officers to acquire this land or an interest therein, by showing merely that they were authorized to reinstall the guns and to test them after installation. That is exactly what they had done before and which the courts found did not constitute a taking. An authority to take land by purchase or by eminent domain is not conferred by the Secretary of War merely because he has authorized, directly or indirectly, certain discharges of guns for testing or other purposes. We must take judicial notice, that to acquire land for fortifications is not, and was not, within the powers ordinarily conferred upon the Ordnance or upon the Artillery. We know that by Act of July 2, 1917, c. 35, 40 Stat. 241, provision was made for speedy acquisition by the Secretary of War, by means of condemnation or purchase, of any land, temporary use thereof or interest therein, needed for the site, location, construction or prosecution of works for fortification or coast defenses; that upon filing a petition for condemnation, the immediate possession thereof to the extent of the interest to be acquired could be obtained; and that by passage of this act the occasions for taking interests in land without first instituting condemnation proceedings had been largely removed. We know that by Act of June 30, 1906, c. 3914, 34 Stat. 764, a contract involving payment of money may not be made in excess of appropriations. 30 Ops. Atty. Gen. 147, 149. We know that Act of March 3, 1919, c. 99, § 6, 40 Stat. 1305, 1309, required that estimates of appropriation for fortifications and other defense works for the year beginning July 1, 1920, be submitted to Congress in the Book of Estimates. And we may take judicial notice of the fact that in submitting estimates of the amount needed for the year beginning

July 1, 1920, " For procurement or reclamation of land, or rights pertaining thereto, needed for site, location, construction, or prosecution of work for fortifications and coast defenses," the Secretary of War asked for only $15,-000 for the whole country for all these purposes; and that no part of that amount was allocated in the estimates to the " Purchase of land and interest in land." Estimates of Appropriation, 66th Cong., 2d sess., Doc. 411, pp. 531, 532. The facts alleged and of which we take judicial notice show not only an absence of intention to take, but the absence of power and authority to take.

The principle on which, under certain conditions, compensation may be recovered in the Court of Claims for private property appropriated for public purposes without condemnation proceedings, leaves unimpaired the long established rules that the United States is not liable for its torts, nor for unauthorized acts of its officers and agents, although performed in the ordinary course of their business and for the benefit of the United States. The Tucker Act merely gives a remedy where the essential elements of contractual liability exist. It does not give a right of action against the United States in those cases where, if the transaction were between private parties, recovery could be had upon a contract implied in law, as in case of unjust enrichment, *Sutton* v. *United States,* 256 U. S. 575, 581, or when a plaintiff waives a tort and sues in contract. *Hijo* v. *United States,* 194 U. S. 315, 323; *Hooe* v. *United States,* 218 U. S. 322. The fact alleged in the petition that at some time in 1919 the War Department offered to purchase part of this land for the fire control station—perhaps only a few square feet, or a rood, out of a 200-acre tract—when considered in connection with the other facts stated, serves not to prove, but to negative authorization to make the taking asserted in this suit. That the offer was not accepted

and that the Government did not institute condemnation proceedings may tend to show that officers of the United States committed a tort on its behalf; but, if a tort was committed, the remedy lies with Congress, not with the courts.