FRIENDSHIP CEMETERY OF ANNE ARUNDEL COUNTY ET AL. *v.* CITY OF BALTIMORE ET AL.

[No. 111, October Term, 1950.]

612

*Decided May 16, 1951.*

*Motion for Rehearing or Clarification filed June 1, 1951.*

*Rehearing denied June 15, 1951.*

*Memorandum on Motion for Clarification filed June 15, 1951.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, GRASON, HENDERSON and MARKELL, JJ.

*Paul F. Due,* with whom were *Marvin I. Anderson* and *Due, Nickerson & Whiteford* on the brief, for the appellants.

*William J. McWilliams* and *Daniel B. Leonard, Assistant City Solicitor of Baltimore*, with whom was *Thomas N. Biddison, City Solicitor*, on the brief, for the appellees.

DELAPLAINE, J., delivered the opinion of the Court.

Friendship Cemetery of Anne Arundel County, a Maryland corporation, and Norman W. Clark and his wife, owners of a lot in the cemetery, petitioned the Circuit Court for Anne Arundel County for a writ of *Mandamus* to compel the Mayor and City Council of Baltimore and the members of the Airport Board of the City Department of Aviation to condemn the cemetery for the Friendship Airport. They are appealing here from an order dismissing their petition.

The Maryland Aeronautics Act authorizes any city in the State to acquire, establish, maintain and operate an airport either within or without its limits. Laws of 1945, ch. 956, Code Supp. 1947, art. 1A, sec. 35. The Act provides that the powers hereby conferred shall include acquisition of property for an airport, but directs that any city, before acquiring property for an airport, shall make application to the State Aviation Commission for a certificate of approval of the site selected to insure it shall conform to minimum standards of safety and shall serve the public interest. Laws of 1945, ch. 760, Code Supp. 1947, art. 1A, sec. 17.

In 1946 the Mayor and City Council of Baltimore passed an ordinance selecting the site for its airport at Friendship in Anne Arundel County, and declaring it to be necessary to acquire for that purpose the tract of land described by metes and bounds in the ordinance. The ordinance authorized and directed the City Aviation Commission (now called The Airport Board, under Baltimore City Charter, 1949 Ed., sec. 137) to acquire all of the land within the designated area, containing approximately 3,000 acres, by purchase if possible, but if impossible, then by condemnation.

The City made application to the Commission for a certificate of approval of the site selected. Among those who opposed approval were representatives of Friendship Methodist Episcopal Church South and the Friendship Cemetery. The church and the cemetery were within the area declared to be needed for the airport. In spite of the protests, the Commission approved the site. We agree that there is nothing in the record to indicate that the Commission believes that the public safety requires that the cemetery must be immediately condemned for the purposes of the airport. In giving its approval to the site selected by the City, the Commission was interested in the general location and the approximate size of the airport and other considerations set forth in the statute.

Work was started on the airport in 1947. Parcels of land completely surrounding the cemetery were acquired. The church was acquired by the City and torn down. The cemetery is located on the Fort Meade Road, which runs from Baltimore to Fort Meade. The cemetery company owns two parcels of land in the area. One parcel contains 3.37 acres, the other 5.75 acres.

The managers of the cemetery company were willing to sell the cemetery. But one of the difficulties was the fact that the City asked for the transfer of the certificates of title to the lots and the consent of the owners to the removal of bodies. The cemetery company thought it impossible to comply with this requirement, because about 1,800 lots had been sold, and about 600 of these had been used. Negotiations covering a period of several years were conducted without avail. The company then asked the Airport Board to institute condemnation proceedings. But it was found that the cost of removing the bodies to another cemetery was enormous. The Maryland statute provides that whenever any State, County or City authorities shall proceed by the power of eminent domain to acquire property which is used as a cemetery, the jury, in assessing damages, shall take into consideration, in addition to the damages for the

land and improvements, the cost of removal of the bodies, markers and monuments to some other suitable or comparable place within the State. Laws of 1945, ch. 804, Code Supp. 1947, art. 33A, sec. 9A. One of the officials of the cemetery offered to move 504 bodies from the cemetery to Meadowridge Cemetery for $109,850. It was also stated that it would cost $72,500 for a parcel of land in Loudon Park Cemetery which could be divided into lots equal in size and number to those in Friendship Cemetery.

As the ordinance directed the Airport Board to acquire, by purchase or condemnation, all the land in the area designated in the ordinance, the Airport Board adopted a resolution on January 22, 1948, declaring that there was no existing necessity for the acquisition of certain parcels of land within the bounds of the airport site, and requesting the Mayor and City Council to authorize the Board to acquire only such parcels in the area as in its judgment may be necessary and proper. On January 26, 1948, the Mayor and City Council, in accordance with the Board's request, passed an amendatory ordinance which authorized and empowered the Board to acquire "such of the pieces or parcels of land * * * at such times as may be necessary or proper to effect the efficient construction, maintenance and operation of the airport."

It is plain that the Mayor and City Council, by the passage of the amendatory ordinance, rescinded the mandatory provision in the original ordinance that the Airport Board shall acquire all of the land in the designated airport area. This modification the Mayor and City Council had the right to make. The law is clear that a municipal corporation has the right to abandon any contemplated improvement and repeal or amend any ordinance providing for the same, and after such abandonment no property owner can compel the corporation to take and pay for property condemned for such purpose. *Pumphrey v. City of Baltimore*, 47 Md. 145, 150, 151,

28 Am. Rep. 446; *City of Baltimore v. Musgrave,* 48 Md. 272, 30 Am. Rep. 458.

Appellants urge, however, that, even though the Airport Board is now vested with discretion to determine what parcels of land it shall acquire, nevertheless the cemetery has been damaged so severely that the Board should be compelled to condemn it. The Airport Board says that it does not need the cemetery at present. It says the cemetery is at least 2,800 feet from the nearest runway and about 350 feet from the nearest taxiway. The question before us is whether private property has been taken within the meaning of Article 3, Section 40, of the Constitution of Maryland, which provides: "The General Assembly shall enact no Law authorizing private property to be taken for public use, without just compensation as agreed upon between the parties, or awarded by a jury, being first paid or tendered to the party entitled to such compensation."

In England any necessary damage inflicted upon the land of an adjacent owner in the construction of a public improvement was *damnum absque injuria.* Moreover, there was nothing in the history of the law or politics in the Colonies to warrant the belief that uncompensated indirect injury from public improvements was one of the evils which the framers of the State and Federal Constitutions sought to eradicate. Accordingly the courts held for many years that the constitutional limitation as to the taking of property applied only to a physical taking of the property, and the owner could not hold a municipal corporation liable for any consequential damages resulting from the proper execution of public works authorized by statute.

Prior to the middle of the nineteenth century, cases did not often arise in America in which property was seriously damaged by the construction of public work on adjacent land, and hence the lack of any remedy for such injury was not seriously felt. But afterwards, in the course of the rapid growth in population of cities and the development of modern means of transportation,

public improvements were undertaken which inflicted serious damage on private property. Many cases of hardship were evident when it became necessary to raise or lower the grades of streets in closely built cities, and in consequence houses were left standing below or above the new grade. While the doctrine was established that consequential injuries were *damnum absque injuria,* the courts in many decisions, while denying the owner compensation, expressed regret at the harshness of the rule and suggested remedial legislation.

In 1836 the Legislature of Massachusetts enacted a statute providing that an owner of property injured by a change of grade might recover his damages from the city or town. In some States constitutional amendments were adopted so as to make certain that property would not be damaged for the public use without compensation. Similarly in England, although there are no constitutional restrictions upon the power of Parliament, it is the practice to insert in acts authorizing the taking of property for public use a provision for the payment of compensation to the owners of lands injuriously affected as well as the owners of lands taken. In Maryland there is no constitutional amendment or general statute requiring compensation to property owners for consequential damages resulting from public improvements.

A liberalization in interpretation of the meaning of "taken" was promoted by the Supreme Court of New Hampshire in 1871 in *Eaton v. Boston, Concord & Montreal R. Co.,* 51 N. H. 504, 12 Am. Rep. 147, 151. There the railroad company had cut through a ridge between the appellant's farm and a river, with the result that the farm was flooded during freshets and large quantities of earth and stones were brought down upon it, making it unfit for cultivation. The Court held this to be a taking of property, explaining that while the term "property" was applied in common parlance to a tract of land, it actually means in law "the rights of the owner in relation to it."

That decision was followed by *Pumpelly v. Green Bay & Mississippi Canal Co.*, 13 Wall. 166, 179, 20 L. Ed. 557, 561, a suit for damages charging the canal company with overflowing the plaintiff's land by erecting a dam across Fox River. The Court accepted the doctrine that a serious interruption to the necessary use of property, such as the overflowing of land from the construction of a dam across a river, is equivalent to the taking of property.

The Maryland Court of Appeals has adopted the principle that where a municipal or public service corporation does work which causes nearby land to be flooded, so as to destroy or substantially impair its usefulness, there is a taking of property within the meaning of the Maryland Constitution. In *Northern Central R. Co. v. Oldenburg & Kelley*, 122 Md. 236, 243, 89 A. 601, it was held that the action of a railroad in allowing steam or hot water from its roundhouse to flow over the land of the adjoining property owner, so as to make a deep ditch on the land and by undermining the supporting soil to wash away a bridge, was a taking of property within the meaning of the Constitution.

Whether private property which has suffered damage from nearby public improvements has been taken is a question of degree. For instance, in *United States v. Lynah*, 188 U. S. 445, 23 S. Ct. 349, 47 L. Ed. 539, where dams erected by the Government in the Savannah River caused the water to flow back on the land, thus turning a valuable rice plantation into an irreclaimable bog unfit for agriculture, it was held that there was a taking within the meaning of the Fifth Amendment. On the contrary, in *Manigault v. Springs,* 199 U. S. 473, 26 S. Ct. 127, 50 L. Ed. 274, it was held that a flow of water on land to a minor extent, where the damage could be prevented by raising the banks, did not constitute a taking.

In 1914 the Supreme Court held in *Richards v. Washington Terminel Co.*, 233 U. S. 546, 34 S. Ct. 654, 58 L. Ed. 1088, that an owner of property in the neighborhood of railroad tracks could recover for the damages which

resulted from the use of a fanning system to force gases and smoke from a tunnel so near his property as to render it less habitable than it would be otherwise. The Court considered that it was a nuisance of such a character as to amount in effect to a taking of private property for public use.

It is now the law of this State that acts done in the proper exercise of governmental authority which impair the use of nearby private property do not constitute a taking of property within the meaning of the Constitution, unless there is (1) an encroachment upon or physical invasion of the property, or (2) a substantial obstruction of access, or (3) a deprivation and not merely a diminution of light and air. *City of Baltimore v. Bregenzer,* 125 Md. 78, 93 A. 425. In *Taylor v. City of Baltimore,* 130 Md. 133, 143, 99 A. 900 L. R. A., 1917C, 1046, the City of Baltimore erected a sewage disposal plant, and after it was put in operation the sewage was spread over a large area of low land near the plaintiff's property. There arose from the sewage horrible, sickening and disease-breeding odors, which permeated the atmosphere around the plaintiff's property at all hours of the day and night, rendering the dwelling unfit for occupancy. The Court held that the offensive odors created an unsanitary condition, interfered with the use of the property, and impaired its value, and entitled the plaintiff to recover damages, but did not constitute a taking of property.

In 1920 the Court held in *Sanderson v. Baltimore,* 135 Md. 509, 523, 109 A. 425, that where the City, in grading the streets on which the plaintiff's property abutted, excavated the beds of the streets to a depth of between 15 and 20 feet, leaving the property inaccessible to pedestrians except by a steep flight of steps, and absolutely inaccessible to vehicles of every description, there was a taking of private property. The Court found that the grading had resulted in the practical destruction of access to the plaintiff's property.

In 1922 the Supreme Court held in *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U. S. 327, 43 S. Ct. 135, 67 L. Ed. 287, that if the Government installs a battery with the purpose of subordinating the strip of land between the battery and the ocean to the privilege of the Government to fire projectiles directly across it in artillery practice whenever it sees fit, thereby having the result of depriving the owner of its profitable use, the imposition of such a servitude will constitute a taking of property.

In *Krebs v. State Roads Commission*, 160 Md. 584, 154 A. 131, the Court of Appeals held that the fact that the elimination of a grade crossing over a railroad required the removal of the crossing further away from the plaintiff's store, so as to lengthen its distance from the village, did not take his property within the meaning of the Constitution.

In *City of Baltimore v. Himmelfarb*, 172 Md. 628, 631, 632, 192 A. 595, 597, where the plaintiff claimed that his property had been damaged as the result of the construction of a viaduct, we held that, since the right to compensation for property taken for public use does not extend to cases of consequential damage unless there is such severe interference with its use as to amount to the destruction or deprivation of its use, the City of Baltimore was not liable because the plaintiff's property was not deprived of light and air to a material degree. Chief Judge Bond said in the opinion of the Court: "There has been no destruction of access or use of the plaintiff's property. The cutting off of light and air as described could not constitute destruction of it, nor could the blowing of dust and gases into it, except by a fiction too far removed from the fact. * * * The damages are only consequential. * * * Public improvements often cause severe incidental damages for which, under this rule, no compensation may be obtained. But it must be remembered * * * that despite the examples of constitutional amendments and statutes enacted in other jurisdictions to provide the compensation, none have been enacted in

this State; and the fact imposes on the courts all the more firmly the duty of observing the limits of the constitutional prohibition."

In the case before us it was strongly urged that the church and other buildings have been torn down, and that the cemetery is now isolated in the airport area. It was also urged that the owners of cemetery lots had moved to other localities, and that the value of the cemetery property has been impaired as a result of the acquisition of the surrounding properties for the airport. Nevertheless, while a number of the lot owners had removed 79 bodies to other cemeteries, they were not compelled to do so, and there are still more than 500 bodies buried in the cemetery. Thus the cemetery company is still using the property for burial of the dead, and it may continue to do so until it is bought or condemned.

The situation is somewhat different from that in *United States v. Causby*, 328 U. S. 256, 66 S. Ct. 1062, 90 L. Ed. 1206, where airplanes of the United States passed over the plaintiffs' chicken farm adjacent to the airport near Greensboro, North Carolina. In that case the airplanes frightened the chickens and made it necessary for the plaintiffs to give up their chicken business, and also made the members of the family frightened and nervous. It was shown that the planes came close enough at times to appear barely to miss the tops of the trees. The Court of Claims found that the frequent, low-level flights were the direct and immediate cause of the diminution in value of the property. The Supreme Court agreed with the Court of Claims, *Causby v. U. S.*, 60 F. Supp. 751, 104 Ct. Cl. 342, that a servitude had been imposed upon the land, because the flight of airplanes, which skim the surface but do not touch it, is as much an appropriation of the use of the land as a more conventional entry upon it.

It is true that if a landowner is to have full enjoyment of his land, he must have exclusive control of the immediate reaches of the enveloping atmosphere. Otherwise

buildings could not be erected. The landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land. However, in the case before us there has not yet been any actual appropriation of the cemetery property. While the establishment of the airport has caused consequential damage to the property, it has not encroached upon or invaded the property, or destroyed the right of access, or deprived the property of light and air. The cemetery company still retains possession of the property and has access to it over an improved road maintained by the City.

As we have come to the conclusion that it has not been shown that the airport has interfered with the use of the cemetery property to such an extent as to constitute a taking of the property, the order of the Circuit Court dismissing the petition for mandamus must be affirmed.

*Order affirmed, with costs.*

MARBURY, C. J., delivered the following concurring opinion.

I think in this case there has been a taking, but I agree that the petitioners have no right to a writ of *mandamus*. If the property has already been taken, then there is no occasion to require defendant to take it again by condemnation. The proper remedy for the plaintiffs will be found in a suit in trespass, and I see no reason why the measure of damages will not include the special provisions made by the legislature in cases where cemeteries are condemned.

I concur in the result.

MARKELL, J., delivered the following concurring opinion.

I concur in the decision of the court and in the opinion that there was no taking, though that question is not necessary to a decision. I also agree with Judge Marbury that the remedy for a wrongful taking would not be

*mandamus,* but an action for damages. Whether under the *Taylor* case and others an action could now be maintained for damages without taking is a question not now before us.

ON MOTION FOR CLARIFICATION OF OPINION
PER CURIAM.

On consideration of the motion for a clarification of the opinion herein, we have concluded that the question whether or not there has been a taking of the property is not necessary for our decision. We therefore withdraw the opinion expressed that there has not been a taking, and rest our conclusion upon the use of the wrong remedy, *i.e.,* that *mandamus* does not lie.