Whitaker, Judge,
concurring:
I think the reason my brethren and I disagree in our view of this case lies in this:
The majority recognizes that the flights of the B-36’s over plaintiffs’ dwelling did interfere with plaintiffs’ use and enjoyment of it. The court finds as a fact:
* * * After November 1951 the value of the property was diminished (by an amount not shown by the record) by the low flights of B-36 bombers over it. The highest and best use of the property as wheat acreage, and its value therefor, remained the same, but its usefulness for residential purposes was reduced.
In March 1957, before the commencement of flights by B-52 and KO-135 jet aircraft, the highest and best use of plaintiffs’ premises was still for agricultural purposes with some residual value of the improvements *424 thereon for residential purposes in connection with the operation of an owner-occupied farm.
If that is true, then there was a taking at that time of an easement of flight over plaintiffs’ property at the lowest altitude at which these planes were accustomed to fly. This is the holding of the Supreme Court in Portsmouth Co. v. United States, 260 U.S. 327, and in United States v. Causby, 328 U.S. 256. See also Highland Park, Inc. v. United States, 142 Ct. Cl. 269.
In the Gausby case the Supreme Court, after having said that the United States conceded that if the flights over plaintiffs’ property rendered it uninhabitable there would be a taking, said:
There is no material difference between the supposed case and the present one, except that here enjoyment and use of the land are not completely destroyed. But that does not seem to us to be controlling. The path of glide for airplanes might reduce a valuable factory site to grazing land, an orchard to a vegetable patch, a residential section to a wheat field. Some value would remain. But the use of the airspace immediately above the land would limit the utility of the land and cause a diminution in its value. That was the philosophy of Portsmouth Co. v. United States, 260 U.S. 327. In that case the petition alleged that the United States erected a fort on nearby land, established a battery and a fire control station there, and fired guns over petitioner’s land. The Court, speaking through Mr. Justice Holmes, reversed the Court of Claims, which dismissed the petition on a demurrer, holding that “the specific facts set forth would warrant a finding that a servitude has been imposed.” 260 U.S. p. 330. And see Delta Air Corp. v. Kersey, 193 Gra. 862, 20 S.E. 2d 245. Cf. United States v. 357.25 Acres of Land, 55 F. Supp. 461.
The majority says this was a partial taking and that another taking took place when the all-jet B-52 planes began flying over the property in 1951. This is the point of departure between them and me.
When defendant began flying planes over plaintiffs’ dwelling at an altitude and of a character that interfered with plaintiffs’ use and enjoyment of it to an extent sufficient to diminish the value thereof, it thereby took an easement of *425 flight, not only for planes of the character it was then using, but for any character of planes it might use in the future. See Wilson v. United States, 151 Ct. Cl. 271.
Here there was no grant of an easement; defendant took an easement. It asserted the right under its power of eminent domain to invade plaintiffs’ property to an extent sufficient to interfere with plaintiffs’ use and enjoyment of it. But is it to be supposed that the assertion of this right was limited to the use of the B-36’s which defendant was then using? Considering the constant advance in aviation, and in particular the constant improvement in military planes, is it not to be presumed that defendant then asserted the right to fly planes of any character over plaintiffs’ property ? If so, defendant then took an easement of flight for planes of any sort. When easements of flight have been taken heretofore, this court has never confined the easement to a particular type of plane, but has said that it covered planes of all types. See Finding 1 in Causby v. United States, 109 Ct. Cl. 768, 769 (on remand from the Supreme Court); Wilson v. United States, supra. Cf. Matson v. United States, 145 Ct. Cl. 225.
It is true that there was then no positive evidence of such an intention, but, unless we indulge the presumption suggested, plaintiffs would be required to bring a suit as soon as the first interference occurred; then, when it increased, to bring another one, and so on until their property was completely destroyed. It seems to me that plaintiffs were entitled to wait in order to ascertain to what extent defendant’s activities would interfere with their use and enjoyment of their property and then to sue for the entire reduction in value. United States v. Dickinson, 331 U.S. 745; Carl H. Klein v. United States, 152 Ct. Cl. 221, cert. denied 366 U.S. 936.
Flights of planes that do not depreciate the value of one’s property are not compensable; hence, in Highland Park, Inc., v. United States, supra, we held a taking did not occur until the advent of the jets, which first depreciated its value; but here a taking had occurred before the all-jets arrived. The question here is the extent of that taking. I think plaintiffs *426 had a right to wait to ascertain the extent, and then to bring their suit.
The flights of the B-36’s and the flights of the B-52’s were parts of a continuous course of conduct, for which plaintiffs are required to bring but one action.
However, plaintiffs do not ask compensation for the decrease in value caused by the B-36’s, and, hence, I concur in the result reached by the majority.
BINDINGS 0E FACT
The court, having considered the evidence, the report of Trial Commissioner Saul Richard Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiffs, husband and wife, are citizens of the United States and residents of the State of Washington.
2. At all times material to this action, plaintiffs were the owners of three parcels of land in Spokane County, Washington, consisting of approximately 265 acres, described as follows:
parcel a : The Northeast quarter (NE-%) of Section Thirty-four (34), Township Twenty-five (25) North, Range Forty-one (41) East of the Willamette Meridian, except the NE-% of the NE~!4 of said NE-14 and except County roads along the North and East lines thereof.
PARCEL B: The Northeast quarter (NE-14) of the Northeast quarter (NE-14) of the Northeast quarter (NE-%) of Section Thirty-four (34), Township Twenty-five (25) North, Range Forty-one (41) East of the Willamette Meridian, except County Roads.
parcel 0: Tracts Thirty-four (34), Thirty-five (35), Thirty-six (36), Forty-five (45), Forty-six (46), Forty-seven (47), Forty-eight (48), Forty-nine (49), Fifty (50), Fifty-two (52) and the North half (N-%) of Tract Fifty-one (51), all in hazelwood irrigated farms, as per plat thereof recorded in Volume “I” of Plats, page 24; situate in Spokane Comity, Washington.
The improvements on the property consisted of a frame one and one-half story house built about 1890, containing four bedrooms, a bath, a living room and kitchen, 816 square feet of floor space being on the main floor, and 460 feet on the second floor; a barn 55 by 80 feet built about 1908, the floor *427 being partly concrete; .a frame building used as a garage and tool shed, also with a floor partly concrete; two chicken houses; a brooder house; and two wells, one with a windmill and the other with an electric pump and constructed of concrete. Until May 26, 1959, plaintiffs lived on said property and operated it as a diversified farm, raising grain, hay, livestock, chickens, and eggs. The farm was devoted principally to the growing of wheat, for which it was specially suited.
3. On March 1, 1942, a military installation called the Spokane Air Depot was constructed by defendant in the vicinity of Spokane, Washington. The name of the facility was subsequently changed to Fairchild Air Force Base. At the time of the establishment of the Base, 160 acres of plaintiffs’ property (not including the 265 acres described in finding 2) was acquired by defendant and included in the Base. The eastern edge of the Base is approximately one-half mile from the western boundary of plaintiffs’ property, and is approximately two-thirds of a mile from plaintiffs’ home located on the property.
4. Between 1942 and 1951, propeller-driven military aircraft assigned to the Base occasionally flew over plaintiffs’ property in connection with Base operations. These flights were infrequent, were not at exceptionally low altitudes, and did not interfere with plaintiffs’ use and enjoyment of their property.
5. In 1951, the major portion of the present northeast-southwest runway, which is the main runway at the Base, was placed in operation. The runway is in a direct line with the northwestern portion of plaintiffs’ property and particularly in line with the improvements on the property. The northeast end of the runway is approximately 4,000 feet from the west boundary of the northwest corner of Parcel A of the property and approximately 5,000 feet from the improvements. Approximately one-half of the northwest portion of Parcel A is within the approach zone to the northeast end of the runway.
6. In the fall of 1951, a number of aircraft denominated as B-36 bombers were assigned to and began operating from the Base. The B-36 bomber has 10 engines, consisting of 6 reciprocating and 4 jet engines. By the fall of 1952, a full *428 complement of 65 B-36 aircraft were assigned to and operated from the Base. In 1956, approximately one-lialf of the B-36s were transferred from the Base. The other half continued to operate from the Base until May 1957. Thus, the B-36s were flown to and from the Base from the fall of 1951 until May 1957.
7. From 1951 until they were completely replaced in May 1957, the B-36 aircraft flew over plaintiffs’ property at elevations as low as approximately 200 to 600 feet in taking off from or landing on the northeast end of the northeast-southwest runway. Due to the prevailing winds approximately 90 percent of the takeoffs from the runway were made from the southwest end and thus did not fly over plaintiffs’ property except on landing, when the landings would be made from the northeast. Thus, approximately 90 percent of the landings were over plaintiffs’ property.
8. The flights of B-36 aircraft averaged six a day from the fall of 1951 until May 1957, when the Base converted to the B-52 program. However, on many days, there were as many as 15 to 20 B-36 takeoffs and landings, and on some days as many as 40 or 50 takeoffs or landings were made over plaintiffs’ property. Soon after the flights of B-36 aircraft commenced, complaints were made to the Base about the noise caused by this aircraft and thereafter flights were restricted to the hours of 7 a.m. to 11 p.m. This restriction against late night flights continued until conversion to the B-52 program in 1957.
9. The low flights of B-36 aircraft over plaintiffs’ property caused annoyance and inconvenience to plaintiffs and interfered with their enjoyment of the property. The residence suffered from vibration caused by the flights passing over it, and it was not possible to carry on conversations while the planes passed over. Plaintiffs’ sleep was frequently disturbed. By letter of May 11, 1954, plaintiffs wrote to the District Engineer, United States Army Engineer, Seattle, Washington District, Corps of Engineers, as follows:
I am writing you regarding an avigation easement.
We live about % of a mile east of Fairchild air base in a direct line with the N.E.S.W. runway, and take a severe beating from the B-36’s and other planes flying *429 so low overhead. The noise, vibration, and other discomforts are slowly but surely getting the better of our nerves, and after a hard days work as farmers the rest we need we seldom get due to the frequent interruptions in our sleep by planes flying so low. Some nights it is just terrible.
We feel we have taken a large real estate valuation loss because we live so near the runway.
In our previous dealings with the government we have been fair and cooperative and feel we should be reimbursed to a certain extent by an avigation easement over our property. We know such easements are in effect elsewhere.
Please do not think we are trying to get something for nothing. This is a legitimate request.
Would appreciate an immediate reply.
The record does not indicate that any reply was made to this letter. Although plaintiffs continued to reside in their home during the period of the B-36 flights, they never became used or accustomed to the noise and annoyance of the flights. Nevertheless, plaintiffs were able to tolerate and live with the noise and inconvenience, and to continue to reside on the property as their home and farm. The premises during this period did not become uninhabitable.
10. On March 26,1957, defendant brought to the Base certain aircraft denominated as B-52 bombers. The B-52 aircraft is powered by eight jet engines. In May 1957, this aircraft replaced the B-36s. On February 21,1958, defendant brought so-called KC-135 jet tankers to the Base. This aircraft is powered by four jet engines and is used to service the B-52 bomber.
11. On and after March 26,1957, the B-52 and the KC-135 jet aircraft (as had been the situation with the B-36s) were flown at elevations as low as approximately 200 to 600 feet over plaintiffs’ property in taking off from or landing on the northeast end of the northeast-southwest runway. As was the situation with the B-36s, because of wind and weather conditions, approximately 90 percent of the takeoffs of these planes from the northeast-southwest runway are to the southwest, and only 10 percent of the takeoffs are to the northeast over plaintiffs’ property. Similarly, however, 90 percent of the landings involved approaches directly over plaintiffs’ property.
*430 12. By judgment entered April 11, 1957, in a condemnation action, being Civil Action No. 1520 in the United States District Court for the Eastern District of Washington, Northern Division, entitled “United States of America v. 70.60 Acres of Land, etc.,” the United States acquired a clearance easement over 63 acres of Parcel A (Tract 404) of plaintiffs’ property. Just compensation was agreed to by the parties for the clearance easement and plaintiffs have received payment therefor. The clearance easement acquired conferred upon the United States the right to limit the height of structures and trees in the area described to 84 feet. It did not confer the right to fly aircraft at low elevations. The interests in plaintiffs’ property taken by such proceeding were described therein as follows:
a. The continuing perpetual right to top, to cut to ground level, to remove, and to prohibit the growth of trees, bushes, shrubs, or any other perennial growth or undergrowth infringing upon, extending into, extending above, or which could m the future infringe upon, extend into, or extend above the Glide Angle Plane and/or Transitional Surface hereinafter described.
b. The continuing perpetual right to remove, to raze, to destroy, and to prohibit the future construction of buildings or portions thereof, other structures or portions thereof, land, embankments of earth and other materials infringing upon, extending into, extending above the Glide Angle Plane and/or Transitional Surface hereinafter described.
c. The right of ingress to, egress from, and passage on Tract D-404E for the purpose of exercising the rights hereby taken for said public uses.
Deserving, however, to the landowners, their heirs, executors, administrators, successors, and assigns, all right, title, interest, and privilege as may be exercised and enjoyed without interference with or abridgment of the easement and rights hereby taken for said public uses.
The land so to be taken is described as follows :
Tract D-404E
A parcel in the northeast quarter of Section 34, Township 25 North, Range 41, East of the Willamette Meridian, Spokane County, Washington, said parcel being described as beginning at the northwest comer of the *431 said northeast quarter; thence east in the north line 1495.82 feet; thence south 23° 15' east 1200.00 feet; thence south 65°49' west 2138.00 feet to the west line of said northeast quarter; thence north in said line 1990.00 feet, more or less, to the point of beginning.
The land above described contains 63.60 acres, more or less.
The Glide Angle Plane and/or Transitional Surface referred to therein are described as follows in exhibit B to said Civil Action No. 1520:
RUNWAY APPROACH ZONE
The runway approach zone is described as follows: Beginning at a point in the line of prolongation of the center line of the Northeast-Southwest Bunway of the Fairchild Air Force Base, level with and 1000.00 feet distant northeasterly on a bearing of north 66°45'00" east from the northeasterly end of the runway which has an elevation of 2413.40 feet above mean sea level, United States Coast and Geodetic Survey datum, and which point lies south 5°09'00" west 1734.93 feet from the northeast corner of Section 33, Township 25 North, Bange 41, East of the Willamette Meridian, Spokane County, Washington; thence running to the right on a bearing of south 23°15/00// east, forming an interior angle of 90o00'00" with the said line of prolongation of the center line of the runway, 750.00 feet to a point; thence to the left, forming an interior angle of 97°07'30" with the last mentioned line, 10,077.82 feet to a point; thence to the left, forming an interior angle of 82°52'30" with the last mentioned line, 4000.00 feet to a point; thence to the left, forming an interior angle of 82°52,30" with the last mentioned line, 10,077.82 feet to a point 750.00 feet from the point of beginning; thence to the left, forming an interior angle of 97°07'30" with the said last mentioned line, 750.00 feet to the point of beginning.
GLIDE ANGLE PLANE
The glide angle plane is a trapezoidal plane extending over the runway approach zone starting at an elevation equivalent to the center line elevation at the end of the runway and sloping upward from the narrower end at a rate of 1 foot vertically for each 50 feet horizontally.
*432 TRANSITIONAL ZONES
The transitional zones are triangular in shape and lie on each side of and adjacent to the approach zone, as follows: The zones lying on each side of and adjacent to the runway approach zone above defined, begin at points 750.00 feet distant, measured perpendicularly to the prolongation of the center line at a point 1000.00 feet away from the end of the runway involved; thence continuing perpendicularly to the prolongation of the center line 750.00 feet; thence away from the end of the runway, forming an interior angle of 89o08'30" with the last mentioned line, 5,357.60 feet to a point on the outer boundary of the runway approach zone; thence towards the end of the runway, forming an interior angle of 7°59,00" with the last mentioned line, 5398.70 feet along the outer boundary of the approach zone to the beginning.
TRANSITIONAL PLANES
The transitional planes extend upward and outward from the outside boundaries of the glide angle planes sloping upward at a rate of 1 foot vertically for each 7 feet horizontally, measured at right angles to the center line of the runway involved.
13. After the B-52 and KC-135 aircraft were assigned to the Base and commenced operating, the number of takeoffs and landings greatly increased in frequency. Furthermore, flights were made not only during the day but also during all hours of the night. In 1957 there were 39,391 takeoffs and landings made with B-52 aircraft, and in 1958 there were 53,028 takeoffs and landings made with B-52 and KC-135 aircraft. The flights of B-52 and KC-135 aircraft over plaintiffs’ property caused substantially greater noise and were more disturbing, frightening and annoying than were the flights of B-36 aircraft. However, the B-52 and the KC-135 aircraft were flown at the same elevations as the B-36 aircraft over plaintiffs’ property. They did not fly at lower elevations. The B-52 and KC-135 aircraft produce a different and more intense sound than the B-36. Sound studies made near plaintiffs’ residence on plaintiffs’ property of representative flights of aircraft approaching to land over plaintiffs’ property indicate a sound intensity of B-52 and *433 KC-135 aircraft ranging between 93.7 decibels and 105.7 decibels.
14. After the commencement of flights by the B-52 jet bombers, the noise and frequency of the flights were such as to make sleeping in plaintiffs’ home impossible. As a result, they moved to a sleeping shed on their property which was located approximately one-half mile from the residence. Plaintiffs’ home became uninhabitable and the improvements on the property, insofar as they related to the use of the property as an owner-occupied farm, were rendered substantially worthless. Prior to the institution of the instant suit in this court on February 28, 1959, plaintiffs, in November 1958, sold 10 acres of their property. In March 1959, plaintiffs sold the remaining 255 acres. They moved from the premises on May 26, 1959.
15. In taking off, the B-36 would generally use all but 800 to 1,000 feet of the available runway, which in the case of the northeast-southwest runway is 13,901 feet long. The rate of climb initially was 1,000 to 1,200 feet per minute and in taking off to the northeast the B-36 normally crossed over plaintiffs’ property at approximately 500 to 600 feet elevation. When the B-36s flew over plaintiffs’ property on takeoff’s both the jet and reciprocating engines were used under full power, and the jets and propellers working together made a terrific noise. The B-52 and the KC-135 utilize approximately 95 percent of the available runway. The rate of climb of the B-52 and KC-135 initially on a straight course such as that flown in takeoff is 1,500 feet per minute with heavy gross weight. On takeoff the B-52 and KC-135 also crossed plaintiffs’ property at approximately 500 to 600 feet, but sometimes crossed at higher elevations.
16. The northeast-southwest runway is an instrument runway and all landings are controlled by an “instrument landing system” (ILS) and a “ground control approach” (GCA) system. The glide slope angle for these instrument approaches is 2.5 degrees computed so that aircraft landing on the northeast end of the runway touch down at a point 1,800 feet beyond the end of the runway. The approach interception point for the instrument landing system is approximately 4.6 miles from the end of the runway and a consistent *434 rate of descent lias been set up for the B-52 and KC-135. Virtually the identical rate of descent was followed in landings by the B-36. The glide rate of descent for the B-36 was 600 feet per minute and is approximately the same for the B-52 and KC-135.
Between 1951 and 1957, the B-36 aircraft, while approaching for landings, crossed over plaintiffs’ property at elevations as low as approximately 200 to 400 feet when reaching the west boundary on the northeast end of the northeast-southwest runway. The majority of such landing flights were between 300 and 400 feet above plaintiffs’ home. Since 1957 the B-52, and since 1958 the KC-135, also cross over plaintiffs’ property at approximately the same elevation when landing on the northeast end of that runway.
17. In making landings in the B-36, B-52 and KC-135, it is necessary for the pilot to make constant corrections to maintain airspeed but the landings are made throughout the approach at approximately 70-80 percent of full power, whereas on takeoff the aircraft is operated at 100 percent of full power. In landing the change in applied power varies no more than 2 percent, which is due to pilot technique of throttle manipulation in order to maintain the airspeed and constant rate of descent. The reduction in power on landing produces less noise and is less disturbing for that reason. Even when it is necessary to make a so-called go-around, full power is not applied and a go-around is not made unless the aircraft is above 500 feet. Normally, B-36 aircraft used their jet engines only for takeoffs. These engines were generally not used in landing, the 70-80 percent of full power used in these planes on landing being applied to the reciprocating engines.
18. In November 1951, before the flight of B-36 bombers commenced, the highest and best use of plaintiffs’ property was for agricultural purposes as an owner-occupied farm. It was specially suited for the raising of grain. After November 1951 the value of the property was diminished (by an amount not shown by the record) by the low flights of B-36 bombers over it. The highest and best use of the property as wheat acreage, and its value therefor, remained the same but its usefulness for residential purposes was reduced.
*435 19. In March 1957, before the commencement of flights by B-52 and KC-135 jet aircraft, the highest and best use of plaintiffs’ premises was still for agricultural purposes with some residual value of the improvements thereon for residential purposes in connection with the operation of an owner-occupied farm.
With the commencement of the B-52 jet bomber flights over plaintiffs’ property on or about March 26, 1957, plaintiffs’ use and enjoyment of their property was so adversely affected as to render substantially worthless the improvements on the property, since plaintiffs’ home was no longer habitable and the other improvements were essentially related to the use of the property as an owner-occupied or residential farm. Thus, plaintiffs’ premises lost such residual value for residential purposes as they may have had considering the flights of B-36 aircraft. The only exceptions would be that even for a nonresident farm operation, the wells, making water available to the property, would be of some benefit, and the other buildings, especially the barn, could be used for temporary machinery or crop storage purposes. The highest and best use of the property after March 26, 1957, was for nonresidential agricultural purposes.
20. Plaintiffs contend that the fair market value of their property was, after the commencement of the B-52 jet aircraft flights in March 1957, reduced by the sum of $9,000, said reduction reflecting the value of the improvements on the property. Defendant contends that the effect on the fair market value of plaintiffs’ property by the commencement of such flights on or about March 26,1957, was to cause a reduction therein in the amount of only $3,700, and that its liability if any (i.e., not considering its statute of limitations defense), should be restricted to such amount.
As shown by finding 2, the four-bedroom house was an old one, having been built approximately 67 years prior to March 1957. However, it had been maintained fairly well throughout the years. It had been improved by such modern conveniences as plumbing and electricity. As of March 1957, the barn was approximately 49 years old. These two structures comprised the greater part of the value represented by the improvements. Taking into consideration the entire *436 record, including the opinions of the real estate appraisers offered by the parties, the value of comparable properties, especially wheat farm operations, the reduction in value already caused prior to March 26,1957 by the B-36 flights, the further reduction in value caused (for which plaintiffs have already been paid) by the taking of the clearance easement referred to in finding 12, and such residual value as the improvements still would have incident to a nonresidential agricultural operation, as described in finding 19, it is concluded that the effect on the fair market value of plaintiffs’ property by the flights of the B-52 jet bombers was to reduce such value by the sum of $6,000.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover, and it is therefore adjudged and ordered that plaintiffs recover of and from the United States the sum of six thousand dollars ($6,000), together with interest thereon, as part of just compensation, at the rate of four percent (4%) per annum, from March 26,1957, the date of taking, to date of payment.
It is further concluded as a matter of law that defendant is vested with a perpetual easement of flight for the aircraft in use at the time of taking, March 26, 1957.