529 A.2d 829

**MARYLAND PORT ADMINISTRATION, et al.**

v.

**QC CORPORATION.**

**No. 119, Sept. Term, 1986.**

Court of Appeals of Maryland.

Aug. 21, 1987.

Motion for Reconsideration Denied Oct. 5, 1987.

Ralph S. Tyler, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen., Andrew H. Baida, Tracy V. Drake, Asst. Atty. Gen. and Janice G. Salzman, Sp. Asst. Atty. Gen., on the brief), Baltimore, for appellant.

Richard A. Reid (C. Larry Hofmeister, Jr., Keith R. Truffer and Royston, Mueller, McLean & Reid, on the brief), Towson, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, COUCH* and McAULIFFE, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), Specially Assigned.

RODOWSKY, Judge.

Maryland Constitution, Art. III, § 40 prohibits the General Assembly from enacting any law "authorizing private property, to be taken for public use, without just compensation...." Taking private property for public use without compensation is also barred by the Fifth Amendment to the United States Constitution. This case involves whether, by operating a hazardous waste disposal facility on its own land, the State of Maryland has taken adjacent leasehold property of the plaintiff. The Court of Special Appeals concluded that there was sufficient evidence from which a jury could find that a taking had occurred. *QC Corporation v. Maryland Port Administration*, 68 Md.App. 181, 510 A.2d 1101 (1986). We shall hold that there was no taking.

In a corner of the Baltimore City harbor, between Curtis Bay and the Anne Arundel County line, lies Thoms Cove, an indentation of the Patapsco River between Leading Point and Hawkins Point. Motor vehicle access to the area is by way of Quarantine Road.[1] Arrayed along the west side of

---

* Couch, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV,**

　　** Section 3A, he also participated in the decision and adoption of this opinion.

1. In 1883, when the area was part of Anne Arundel County, the City of Baltimore established near Hawkins Point a quarantine station against contagious diseases brought toward the City by water. *See Baltimore City v. Fairfield Improvement Co.*, 87 Md. 352, 359, 39 A. 1081, 1082 (1898).

Thoms Cove in a roughly north to south fashion are four properties owned by the petitioner, Maryland Port Administration (M.P.A.), an agency of the State of Maryland within the Department of Transportation.[2] Northernmost of these parcels is a six acre lot (the North site). Adjacent to the North site is a roughly two acre parcel leased by M.P.A. to a corporate predecessor of the respondent, QC Corporation (QC), under a lease most recently renewed in January 1979. The initial term of the renewal lease was for five years, with options in QC to renew for two successive terms, each of five years. The lessee covenanted to use the property "solely for the purpose of a chemical processing plant and for associated purposes[.]" Contiguous to the QC site on the south is Disposal Site Two, a twelve acre parcel, and south of that, across Thoms Creek, is a twenty acre parcel, Disposal Site One. At the times relevant to this case, Disposal Sites One and Two were used as landfills for hazardous wastes.

The substances deposited at Disposal Site One included, and at Site Two consisted exclusively of, chromium ore tailings from Allied Chemical Corporation (Allied). Approximately five percent of these tailings are hexavalent chromium (chrome), a carcinogen. In 1967 M.P.A. had contracted to dispose of chromium ore tailings for Allied until August 31, 2007, up to a maximum of six million cubic yards. Until February 1975 M.P.A. used the material from Allied as fill at the Dundalk Marine Terminal. From February 1975 until July 1975 Allied disposed of its chrome refuse at a commercial landfill. Thereafter Allied delivered much of that material to Site One. Under 1977 legislation M.P.A. needed a license to continue accepting chrome and, when it stopped doing so, Allied in February 1978 sued M.P.A. On August 5, 1980, state health officials licensed Site Two for three years and Allied, which had been using a commercial

---

**2.** It appears that M.P.A. is both owner of the underlying fee and a sub-sublessee of its own property. These technicalities of title are immaterial to the issues involved here.

facility in the interim, resumed depositing chrome bearing material at the Hawkins Point facility of M.P.A.

The disposal sites at Hawkins Point are divided into specially prepared subareas called "cells." A cell is a large, elongated, earthen cavity with sloping sides. The sides and bottom are lined with a relatively impervious clay, two feet thick. Tailings are brought to the disposal site in tarpaulin covered dump trucks. The material ideally should have about twenty percent moisture content so that it will neither blow freely in the air nor drip to the ground. The tailings are dumped into the current working area of a cell and bulldozed across the width of the cell. When approximately 100 feet down the length of the cell has been filled, that working area is covered with one foot of dirt and the process is repeated in the next working area. Depending on the volume of deliveries, a working area can have tailings exposed to the air for as long as one week at a time. Each cell also contains one or more wells so that, when the cell is completely covered, it can be tested for leachate and excess liquid pumped out of the cell. When Disposal Site Two was approaching capacity under the 1980 permit, the state health department in November 1982 licensed Site Two to accept chrome in additional cells to be constructed overtop of the original, filled cells.

During the process leading to the 1982 permits there were meetings between public officials and members of a small residential community in Hawkins Point. During that period the City of Baltimore was interested in improving access to Hawkins Point by completing an interchange between the Baltimore Beltway and Quarantine Road and in acquiring land in Hawkins Point for a trash landfill. Because of the land use impact of these public improvements on the Hawkins Point residential community, the State agreed to relocate the residents. There is no evidence that public health officials ever recommended the relocation. A witness for the State who participated in the relocation decision denied that health concerns were a factor and that denial is unrebutted.

The 1982 hazardous waste disposal permit ran for three years. In February 1983 the Allied-M.P.A. litigation was settled. Pursuant to that settlement M.P.A. leased the landfills at Hawkins Point to Maryland Environmental Service (M.E.S.), a state agency in the Department of Natural Resources which had been operating the landfills for M.P.A. since 1980.

M.E.S. was created by the General Assembly

to provide water supply and waste purification and disposal services in compliance with State laws, regulations, and policies governing air, land, and water pollution to public and private instrumentalities, and with safeguards to protect the autonomy of the political subdivisions and the rights of the private entities it serves. [Md.Code (1974, 1983 Repl.Vol.), § 3–102(a) of the Natural Resources Article.]

QC and its predecessors have operated a chemical processing plant at the QC site since 1965. For many years the business bought moist ferrous sulfate crystals from Glidden Corporation, dried the crystals, packaged them, and sold them for treating drinking and waste water and for use in fertilizers and animal feeds. Due to changes in the availability of raw materials and concern that Phizer Incorporated would become a competitor, QC began reducing the processing of moist ferrous sulfate at Hawkins Point in April or May of 1982 and began buying a finished product from Phizer which QC at Hawkins Point bagged under its own label. By approximately April of 1983, QC had discontinued all processing at Hawkins Point.[3] On July 21, 1983, the instant suit was filed. The plant was kept in operational readiness until September or October 1983 when it was manned by not more than two employees. In January 1984 QC began dismantling the Hawkins Point plant and by April

---

3. In February 1982 QC had opened a second processing plant in Missouri. One of the factual issues in the case is whether the opening of the new plant in Missouri, or the hazardous waste landfill, led to the shutdown of QC's operations at Hawkins Point.

of that year had removed all salvagable equipment to its other plant in Missouri.

QC's position in this litigation is that, but for the adjoining hazardous waste landfill, it would have continued to do business out of Hawkins Point until the expiration of the last renewal term under its lease. The president of QC testified, in essence, that QC closed the Baltimore plant out of concern for the integrity of its environmentally sensitive product and for the health of QC's employees. There was evidence that material from the landfill, as well as material which dripped from the truck beds or fell from the truck tires, dried and blew onto QC's property.

The evidence based on air monitoring reveals no measurement at the QC plant or at Disposal Site Two which exceeded two micrograms of chrome per cubic meter of air. The maximum permissible exposure to chrome under state health and safety regulations applicable to workplaces is fifty micrograms, *i.e.*, twenty-five times higher than the measured quantities.

QC's complaint sounded in (1) breach of the implied in law covenant of quiet enjoyment, (2) constructive eviction, (3) inverse condemnation, and (4) nuisance. The trial court sustained a demurrer to the nuisance claim due to QC's failure to give the notice required under the statutory waiver of sovereign immunity. That determination has not been challenged on appeal. A directed verdict was granted on the quiet enjoyment and constructive eviction claims. The unconstitutional taking issue was submitted to the jury, but it was unable to agree. Thereupon the circuit court granted judgment n.o.v. in favor of M.P.A. on that claim.

The Court of Special Appeals reversed as to all three of the claims appealed. We issued the writ of certiorari on the State's petition but limited our review to the taking question. We deemed that issue to be of general public importance, as contrasted with the factually unique questions of constructive eviction and quiet enjoyment arising where a landlord both limits the use of the demised premises to

chemical processing and also operates a hazardous waste landfill on adjoining property.

The Court of Special Appeals believed that the trial court had incorrectly concluded that QC's property could not have been taken unless QC had been deprived of all beneficial use thereof. The intermediate appellate court articulated the standard as "substantial" interference. It distinguished between regulatory takings, to which the trial court's standard is ordinarily more appropriately applied, and takings arising from other activities by government, which we shall call the eminent domain power. The court quoted from P. Freund, *The Police Power* § 511, at 546–47 (1904) the generalization that the "state takes property by eminent domain because it is useful to the public, and under the police power, because it is harmful. . . ." Finding the same theme repeated in Sax, *Takings and the Police Power*, 74 Yale L.J. 36, 62 (1964), the court quoted favorably the following rule proposed by Professor Sax:

> "[W]hen economic loss is incurred as a result of government enhancement of its resource position in its enterprise capacity, then compensation is constitutionally required; it is that result which is to be characterized as a taking. But losses, however severe, incurred as a consequence of government acting merely in its arbitral capacity are to be viewed as a non-compensable exercise of the police power." [68 Md.App. at 205, 510 A.2d at 1113 (quoting 74 Yale L.J. at 63).]

It is to be noted that the rule espoused by Professor Sax in his article at 74 Yale L.J. 36 (Sax I) treats any economic loss, unqualified as to degree, as a taking, if the loss results from an enterprise activity. The Court of Special Appeals saw the rule of Sax I "foreshadowed" in the Supreme Court cases involving overflights of airplanes or artillery shells, *i.e.,* in *Griggs v. Allegheny County,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), and *Portsmouth Co. v. United States,* 260 U.S. 327, 43 S.Ct. 135, 67

L.Ed. 287 (1922). The court then turned to a passage, quoted more fully below, from *Hardesty v. State Roads Comm'n*, 276 Md. 25, 343 A.2d 884 (1975).

> In stating that the weight of authority does not support the view that a physical appropriation is prerequisite to a "taking" of property in the constitutional sense, Nichols [*Eminent Domain* (3d ed. 1970)] says at § 6.3:
>
> > "The modern, prevailing view is that any substantial interference with private property which destroys or lessens its value (or by which the owner's right to its use or enjoyment is in any substantial degree abridged or destroyed) is, in fact and in law, a 'taking' in the constitutional sense, to the extent of the damages suffered, even though the title and possession of the owner remain[ ] undisturbed." [*Id.* at 32, 343 A.2d at 888.]

Reading *Griggs, Causby,* and *Portsmouth* to have applied a substantial deprivation of use test, the Court of Special Appeals then held that, under the evidence most favorable to QC, the jury could have found that the State had "substantially depriv[ed] QC of the use of its property as a ferrous sulfate processing plant." 68 Md.App. at 208, 510 A.2d at 1115.[4]

---

**4.** The State's petition for certiorari phrased the questions presented to be:

    1. Is the State's operation of a hazardous waste disposal facility a lawful exercise of the State's police power?

    2. Does the leasing of State property by one state agency [M.P.A.] to another state agency [M.E.S.] for use as a hazardous waste disposal facility constitute ... an unlawful taking of a leasehold interest in adjoining State property when the neighboring lessee retains the use of its premises and remains on the premises for almost a year after filing suit?

In order to direct the briefing of the taking issue to the grounds of decision actually addressed by the Court of Special Appeals, we substituted the following question in our order granting certiorari: May a property owner recover compensation from the State for inverse condemnation where state action that is not regulatory causes interference with use of the property but not a deprivation of all beneficial use thereof?

I

To date courts have not developed a test which can be comprehensively and consistently applied to determine whether a government has taken property.[5] Legal commentators have attempted to distill the operative principle, or to construct an all inclusive decisional model.[6] Sax I is an effort of that type. We give no weight to the theory, therein expounded, that any and all loss caused by the enterprise function of government is compensable as a taking. Professor Sax has disavowed that aspect of the theory he advanced in Sax I. *See* Sax, *Takings, Private Property and Public Rights*, 81 Yale L.J. 149 (1971) (Sax II).[7] Further, emphasis on the nonregulatory or "enterprise" nature of the governmental activity which may be

---

**5.** "Even the wisest lawyers would have to acknowledge great uncertainty about the scope of [the United States Supreme] Court's takings jurisprudence." *Nollan v. California Coastal Com'n,* —— U.S. ——, ——, 107 S.Ct. 3141, 3163, 97 L.Ed.2d 677, 707 (1987) (Stevens, J., dissenting).

**6.** These writings include Berger, *A Policy Analysis of the Taking Problem,* 49 N.Y.U.L.Rev. 165 (1974); Blume and Rubinfeld, *Compensation for Takings: An Economic Analysis,* 72 Calif.L.Rev. 569 (1984); Costonis, *Presumptive and Per Se Takings: A Decisional Model for the Taking Issue,* 58 N.Y.U.L.Rev. 465 (1983); Mandelker, *Inverse Condemnation: The Constitutional Limits of Public Responsibility,* 66 Wis.L.Rev. 3 (1966); Van Alstyne, *Taking or Damaging by Police Power: The Search for Inverse Condemnation Criteria,* 44 S.Cal.L.Rev. 1 (1970); and Van Alstyne, *Inverse Condemnation: Unintended Physical Damage,* 20 Hastings L.J. 431 (1969).

**7.** In Sax II the author says:
The following pages should make clear the respects in which my present thoughts depart from those expressed in my earlier article. In general, I am still persuaded that neither the traditional diminution-of-value theory nor the noxious use theory is acceptable. Also unchanged is my view that neither history nor reason require us to protect a property owner against total economic loss when the regulatory authority of government is exercised for a legitimate purpose. I am compelled, however, to disown the view that whenever government can be said to be acquiring resources for its own account, compensation must be paid. I now view the problem as considerably more complex. The pages that follow are an extended commentary on why and how my views have changed on this point. [81 Yale L.J. 149, 150 n. 5.]

involved in the particular taking claimed minimizes the distinction between a compensable taking and noncompensable damage which has long prevailed in takings jurisprudence and which is discussed in part II, *infra.*  Briefly, 2 J. Sackman, *Nichols on Eminent Domain* § 6.38[1], at 6–114–15 (3d ed. 1980) gives the following summary:

> [T]he Supreme Court of the United States and the great majority of the state courts have adhered to the old doctrine and hold that when the owner of property continues in use and possession as before, it is not taken in the constitutional sense, however much it may be depreciated in value.  In other words, when a municipal or a public service corporation, or other party to whom the power of eminent domain can be constitutionally delegated, inflicts injury upon private land under authority of and in compliance with an act of the legislature, and there has been no want of reasonable care or skill in the execution of the power, such party is not liable in an action at law for such injury, even though the same act if done without legislative sanction would be actionable, unless the injury is of such a character as to deprive the owner of the use and possession of his land, or compensation is required by special statutory or constitutional provision whenever property is damaged by the construction of a public improvement.  [Footnotes omitted.[8]]

## II

The Supreme Court considers its cases clearly to have established "that permanent occupations of land by such installations as telegraph and telephone lines, rails, and underground pipes or wires are takings even if they occupy only relatively insubstantial amounts of space and do not seriously interfere with the landowner's use of the rest of his land." *Loretto v. Teleprompter Manhattan CATV*

---

**8.** Some state constitutions, in order to liberalize the strictness of the above-quoted rule, require the payment of compensation when property is damaged, even if the loss does not mount up to a taking.

*Corp.*, 458 U.S. 419, 430, 102 S.Ct. 3164, 3173, 73 L.Ed.2d 868, 878 (1982). *Loretto* involved the installation of thirty-six feet of cable, one-half inch in diameter, and of two, sixty-four cubic inch, metal boxes on the roof of an apartment building as part of a cable television service furnished under an exclusive franchise. The Court "affirm[ed] the traditional rule that a permanent physical occupation of property is a taking." *Id.* at 441, 102 S.Ct. at 3179, 73 L.Ed.2d at 886. The *Loretto* kind of taking has strong overtones of a continuing trespass.

Here, the State has not excavated on QC's land; the trucks hauling waste do not cross over QC's land; the waste is not dumped on QC's land; and the bulldozers do not spread the waste onto QC's land. The alleged interference with QC's use is dust blowing onto QC's land. The jury could find that the dust included at times chrome originating from Disposal Site Two and that particularly in dry, hot weather, dust blew with some regularity, even if intermittently. The alleged interference is not, however, that the dust itself is thick and choking; rather, the taking claim is based primarily on the fact that the ambient air over QC's property contains chrome. Scientific measurements of the airborne chrome quantify it at two micrograms per cubic meter of air. A microgram is one-millionth of a gram. These microscopic particles do not constitute a physical invasion of QC's property in the *Loretto* sense.

Nor does QC contend that the landfill is negligently operated or maintained. A claim bottomed on negligence would have produced the same legal hurdle which QC encountered with respect to the claim QC had expressly based on the tort of nuisance.[9] Consequently, the claim of taking in this case is based on the juxtaposition with QC's chemical processing plant of the State's hazardous waste disposal facility which, although operated with all due care, generates airborne particles of chrome.

---

**9.** In part III, *infra,* we shall consider the taking claim from a nuisance point of view.

It is also clear that QC's theory of its inverse condemnation case is that the State's operation of the hazardous waste disposal facility has effected a taking of all of QC's interest in its leasehold. QC does not claim a partial taking either in the extent of the land involved or as to the duration of the taking, other than as limited by the expiration of the leasehold itself. Pursuant to that theory of the case QC's real estate expert opined that the present value of the leasehold was $296,962 on the date QC vacated the property. QC's accountant testified that the expense of dismantling and shipping to Missouri salvagable equipment at Hawkins Point was $30,021.45 while the book value of equipment abandoned at Hawkins Point was $87,916.50. Obviously QC does not contend that the State must purchase a servitude over QC's leasehold because of the escape from the State's land of particles of pollutant.

In cases in which there was no physical invasion, but in which the claim of taking was based upon the adverse effect on the alleged condemnee's property of some nearby public improvement or activity, the Supreme Court and this Court long ago developed the rule that no taking was effected by consequential damages. The impact on the plaintiff's property had to be special to it and of a high degree. Specific illustrations from the cases best communicate the degree of adverse impact required for that kind of a taking.

When the City of Chicago was constructing a tunnel in order to carry LaSalle Street beneath the Chicago River, the work impacted on business premises located in one of the quadrants formed by the intersection of the street with the river. The street was excavated and a coffer-dam, erected in the river, left the business unable to use its pier. There was, however, no invasion of the business premises as such; the interference was not permanent; and the work progressed with reasonable diligence. The Supreme Court in 1879 held there was no taking. *Transportation Co. v. Chicago*, 99 U.S. (9 Otto) 635, 25 L.Ed. 336. The damage was "consequential." The Court reasoned:

[I]t is the prerogative of the State to be exempt from coercion by suit, except by its own consent. This prerogative would amount to nothing if it does not protect the agents for improving highways which the State is compelled to employ. The remedy, therefore, for a consequential injury resulting from the State's action through its agents, if there be any, must be that, and that only, which the Legislature shall give. It does not exist at common law. The decisions to which we have referred were made in view of *Magna Charta* and the restriction to be found in the Constitution of every State, that private property shall not be taken for public use without just compensation being made. But acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the State or its agents, or give him any right of action. This is supported by an immense weight of authority. [*Id.* at 641–42, 25 L.Ed. at 338.]

On much the same reasoning, and at about the same time, this Court decided *Cumberland v. Willison*, 50 Md. 138 (1878). A mill owner in Cumberland claimed in inverse condemnation because the extension by the municipality of a paved street increased the amount of surface water collected on the street. That water carried mud and debris into a stream below the plaintiff's property, and damned the stream at that point. This interrupted the stream flow on which the mill relied. There was no taking. The damage was consequential.

Maryland cases in which a property owner has based a taking claim on a nontrespassory denial of access have presented some serious hardships which did not amount to takings. *Krebs v. State Roads Comm'n*, 160 Md. 584, 154 A. 131 (1931) involved a storekeeper whose business was a few hundred feet from the village which produced eighty percent of the store's volume. Railroad tracks lay between

the store and the village and a state highway crossed the tracks. When the state relocated the highway to eliminate the grade crossing, the store was left one-half to three-quarters of a mile from the village by road. No part of the plaintiff's land was acquired in the relocation. The adverse economic impact on the plaintiff was simply consequential to the highway project and not compensable as a taking.

In *Mayor of Baltimore v. Bregenzer*, 125 Md. 78, 93 A. 425 (1915), the plaintiff owned a number of party wall townhouses, the faces of which abutted a public highway at the place where an approach to an overpass was constructed up to the edge of the highway right-of-way. The change in elevation of the street cut off light and air to window wells in the basements of the houses and also required the plaintiff to change the steps leading to the front doors of the houses. There was no taking. Nor was there a taking by a similar change of grade requiring additional steps to be installed in *Baltimore & O.R.R. v. Kane*, 124 Md. 231, 92 A. 532 (1914). And when the abutment for an elevated street railway line was placed nine feet eight inches from the curb in front of the plaintiff's house, thereby preventing ordinary vehicular access, there was no taking. *See Garrett v. Lake Roland R.R.*, 79 Md. 277, 29 A. 830 (1894).

On the other side of the taking line is *DeLauder v. Baltimore County*, 94 Md. 1, 50 A. 427 (1901). Access to the plaintiff's farm from the public highway was over a right-of-way through the land of another. The county blocked the right-of-way by guardrails placed along the edge of the highway, the elevation of which had been raised as it approached a newly constructed culvert. The plaintiff could not use the right-of-way with a team of horses. This Court said that "[t]he injury inflicted upon Mrs. DeLauder is not the rendering the use of her right of way inconvenient or expensive, but it is the destruction of its use, and its destruction is a *taking* in as just a sense as the appropriation of a gravel bank for the repair of a public road would be a taking." *Id.* at 8, 50 A. at 429 (emphasis in original). Because the plaintiff presumably could have climbed over

the guardrail by foot, one teaching of *DeLauder* seems to be that language in the takings opinions referring to "destruction" or to a deprivation of "all" use is not to be read in an absolutely literal fashion.

A taking was also held to have occurred in *Walters v. Baltimore & O.R.R.*, 120 Md. 644, 88 A. 47 (1913), another case arising out of the elimination of railroad grade crossings in South Baltimore. In *Walters* the newly elevated street approaching the overpass was approximately five feet above the prior ground level and within three inches of the face of the plaintiff's house. The new roadway and sidewalk were supported by concrete columns, one of which stood twelve inches from the plaintiff's front door. The result "was to effectually bar all ingress to and egress from the premises, unless by means of a ladder from the second floor window to the newly constructed foot-way." *Id.* at 652, 88 A. at 50.

Factually more analogous to QC's claim is *Taylor v. Mayor of Baltimore*, 130 Md. 133, 99 A. 900 (1917) where the plaintiff owned a hotel on property lying approximately 1500 feet from the site of Baltimore City's then newly constructed sewerage disposal facility at Back River. The odors were " 'simply unbearable,' " particularly when the wind blew from the direction of the plant. Hotel patrons became nauseated and would have to leave the table. At times it was necessary to close the windows and even then the odors interfered with the sleep of some of the patrons. The plaintiff's evidence showed a $10,000 depreciation of the property resulting from the siting of the disposal facility. This Court held that there was no taking. The City had not encroached upon or physically invaded the plaintiff's property, there was no "substantial destruction of the rights of ingress to and egress from the property," and no "deprivation ... of light and air[.]" *Id.* at 143, 99 A. at 904. The City was liable, however, in damages for nuisance. *See* Clarke, *Municipal Responsibility in Tort in Maryland*, 3 Md.L.Rev. 159, 163, 171 n. 74 (1939).

The most recent Supreme Court counterpart to the class of Maryland cases reviewed above is *Richards v. Washington Terminal Co.,* 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088 (1914). The plaintiff owned a residence, which had been let to a tenant, located in the City of Washington, 114 feet from the line of a railroad which had been built and was operated pursuant to an act of Congress. Smoke, gases, and cinders from locomotives covered the outside of the plaintiff's house and entered it, causing depreciation in the value of the house and its contents and leaving the plaintiff unable to find a tenant. Part of the damage to the property came from operations of the railroad in the open air, but there was also one end of a railroad tunnel nearby. Fans in the tunnel blew smoke, gases, and cinders from within the length of the tunnel out the end near the plaintiff's house. The court held that damage caused by the ordinary operation of the railroad in the open air was not compensable as a taking. The court also held that

> the special and peculiar damage to the plaintiff as a property owner in close proximity to the portal is the necessary consequence [of the legislatively authorized activity], unless at least it be feasible to install ventilating shafts or other devices for preventing the outpouring of gases and smoke from the entire length of the tunnel at a single point upon the surface, as at present. Construing the acts of Congress in the light of the 5th Amendment, they do not authorize the imposition of so direct and peculiar and substantial a burden upon the plaintiff's property without compensation to him. If the damage is not preventable by the employment at reasonable expense of devices such as have been suggested, then plaintiff's property is "necessary for the purposes contemplated," and may be acquired by purchase or condemnation ... and pending its acquisition defendant is responsible. If the damage is readily preventable, the statute furnishes no excuse, and defendant's responsibility follows on general principles. [*Id.* at 557, 34 S.Ct. at 658, 58 L.Ed. at 1093.]

Comparing the facts of the case before us to *Richards v. Washington Terminal Co.* reflects that the chrome particles which lie at the core of QC's claim are not concentrated at a single source and artificially blown off of the State's property. The airborne particles which pass over QC's land are more analogous to the locomotive emissions into the open air in the *Washington Terminal*'s case. Those did not produce a taking.

Interestingly, the last time that a majority opinion of the Supreme Court cited *Washington Terminal* was the 1946 opinion in *United States v. Causby, supra,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206, on which QC and the Court of Special Appeals heavily relied. *Causby,* as refined in 1962 by *Griggs v. Allegheny County, supra,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585, deals with a governmental body which operates an airport taking adjacent land owned by others through airplane takeoffs and landings. In *Causby* the path of glide of aircraft descending to land passed "directly over" the plaintiffs' property, eighteen feet above the highest tree. 328 U.S. at 258, 66 S.Ct. at 1064. Noise, lights, and vibrations from the planes so frightened chickens being raised by the plaintiffs that six to ten chickens in one day killed themselves by flying into walls of the chicken houses. "The result was the destruction of the use of the property as a commercial chicken farm." *Id.* at 259, 66 S.Ct. at 1065.

Recently, in *Loretto, supra,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868, the Court explained the taking in *Causby* by what we might call a trespass analysis, saying:

In *United States v. Causby* ... the Court ruled that frequent flights immediately above a landowner's property constituted a taking, comparing such overflights to the quintessential form of a taking:

"If, by reason of the frequency and altitude of the flights, respondents could not use this land for any purpose, their loss would be complete. It would be as complete as if the United States had entered upon the surface of the land and taken exclusive possession of

it." [328 U.S.] at 261 [, 66 S.Ct. 1062, 90 L.Ed. 1206] (footnote omitted).

As the Court further explained,

"We would not doubt that, if the United States erected an elevated railway over respondents' land at the precise altitude where its planes now fly, there would be a partial taking, even though none of the supports of the structure rested on the land. The reason is that there would be an intrusion so immediate and direct as to subtract from the owner's full enjoyment of the property and to limit his exploitation of it." Id., at 264–265 [, 66 S.Ct. 1062, 90 L.Ed. 1206].

The Court concluded that the damages to the respondents "were not merely consequential. They were the product of a direct invasion of respondents' domain." Id., at 265–266 [, 66 S.Ct. 1062, 90 L.Ed. 1206]. [458 U.S. at 430–31, 102 S.Ct. at 3173, 73 L.Ed. at 879.]

This Court has read *Causby* similarly, saying that it was a case "in which the Government was in effect using a part of the respondent's land for the flight of its planes [and] such an immediate and direct intrusion with [respondent's] enjoyment of the property constituted a taking where such damage was substantial." *Bureau of Mines v. George's Creek Coal & Land Co.*, 272 Md. 143, 157 n. 4, 321 A.2d 748, 756 n. 4 (1974). *See also Friendship Cemetery v. Baltimore*, 197 Md. 610, 621, 81 A.2d 57, 62 (1951); *Friendship Cemetery v. Baltimore*, 200 Md. 430, 90 A.2d 695 (1952). In the latter case we held, reviewing judgment on a demurrer to a taking claim, that there had been no taking of a cemetery. No part of the cemetery was physically invaded, but the cemetery alleged that development of an airport around the cemetery had left the cemetery as an "island" (there was, however, access by a public road), that the bodies of approximately eighty of the 600 persons buried in the cemetery had been moved elsewhere by their families because of the airport, and that the cemetery, two-thirds of the lots in which were available for sale, had not sold a lot after the airport project commenced. This

alleged diminution of business caused by the activity at the airport was not enough to generate a triable issue whether there was a taking.

*Ortega Cabrera v. Municipality of Bayamon*, 562 F.2d 91 (1st Cir.1977) is a water pollution case in which the court had to discern the meaning of *Causby*. The city fathers of Bayamon, a municipality in Puerto Rico, had located a sanitary landfill at a wholly inappropriate site above the headwaters of a creek near an underground spring. The landfill became totally saturated and leachate "pollut[ed the creek] with contaminants which included unsafe amounts of arsenic, lead, mercury, fecal coliform, and fecal streptococci." *Id.* at 95. The owners of four properties in the vicinity of the creek produced evidence that their particular properties depreciated from thirty to fifty-five percent for a combined loss to all plaintiffs of $191,000, $117,000 of which resulted from the land's unsuitability for residential subdivision. The First Circuit said that in *Causby* the "Court strongly hinted that it was able to reach [a taking] result in the absence of a finding of near complete destruction only because it was able to characterize the government interference as 'use' of the claimant's property." *Id.* at 101. But, in *Bayamon*, the plaintiff's property could still be used for residential or agricultural use, despite the bad smells and health hazard. No taking was effected by the property's becoming less desirable for possible future subdivision. By contrast, the court noted that those plaintiffs who abutted the creek might be required to fence off an area along the creek. "If that pollution of the creek has had this effect, it would seem plaintiffs [on remand] have a strong argument that the government action destroyed the value of this portion of the land to the same extent as if the city had regularly ... deposited sewage upon it." *Id.*

In the case before us the State is not in effect using QC's land for a hazardous waste disposal site. Simply because chrome particles from Disposal Site Two are transported wherever the ambient air carries them, the State does not thereby use as a dump or otherwise invade QC's property,

any more than the State invades the property of other owners over whose land the particles pass or on which they eventually come to rest. There is no taking in this case under a traditional takings analysis. There is no physical invasion, no imposition of the equivalent of a servitude and no special damage which is unique to QC's property.

## III

It is clear, however, that a taking may occur without physical invasion. Recent illustrations of this result can be found in regulatory taking cases. *See, e.g., Nollan v. California Coastal Com'n,* —— U.S. ——, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *Howard County v. JJM, Inc.,* 301 Md. 256, 482 A.2d 908 (1984); *Maryland-Nat'l Cap. Park & Planning Comm'n v. Chadwick,* 286 Md. 1, 405 A.2d 241 (1979). In this part III we shall assume that *Causby* is not explained as being primarily a physical invasion case; rather, we shall assume that the controlling feature in *Causby* was the fact that the overflights killed the landowner's chickens in numbers which destroyed the use of the property as a chicken farm. This concept of taking which looks to the governmental activity's effect on the actual uses conducted on the condemnee's premises borrows more from nuisance than from trespass law. The theory has been given judicial recognition in *Thornburg v. Port of Portland,* 233 Or. 178, 376 P.2d 100 (1962) and is discussed in Stoebuck, *Condemnation by Nuisance: The Airport Cases in Retrospect and Prospect,* 71 Dickinson L.Rev. 207 (1967).[10]

---

**10.** We have also seen in part II illustrations of enterprise activities conducted wholly on the government's land which produce takings under circumstances which might also constitute a nuisance. *See, e.g., Richards v. Washington Terminal Co.; DeLauder v. Baltimore County; Walters v. Baltimore & O.R.R.,* all *supra. Washington Terminal,* however, dealt with visible and tangible deposits of soot and ashes while the ingress and egress cases can be considered to present a deprivation of an abutting owner's property right in the public street, in addition to an interference with the use of the abutting property.

Here the undisputed facts reflect that any interference with QC's business was not to the degree found in *Causby.* Indeed, any interference here was not to the degree found in *Friendship Cemetery v. Baltimore, supra,* 200 Md. 430, 90 A.2d 695, or in *Krebs v. State Roads Comm'n, supra,* 160 Md. 584, 154 A. 131, or in *Taylor v. Mayor of Baltimore, supra,* 130 Md. 133, 99 A. 900, in all of which there was held to be no taking.

There is no evidence that QC's product was ever contaminated by chrome. Prior to March 1982 QC had engaged an independent laboratory to perform quality control testing. There is no evidence that these tests ever reported chrome in the product.[11] QC discontinued quality control analysis after February 1982 because the reports had revealed nothing significant and because QC, for reasons relating to the market, had begun to purchase bagged, finished product for resale. QC's liability insurer in September 1982 caused QC's product to be analyzed and found that there were no appreciable changes in the chrome content. There is no evidence that any customer stopped doing business with QC because QC's processing plant was located adjacent to a hazardous waste disposal facility.

The evidence also dealt with air quality monitoring for occupational and public health purposes. On November 16, 1982, QC's liability insurer monitored at two fixed locations within QC's plant and attached a third monitor to the single employee on the premises. This testing measured no more than two micrograms of chrome per cubic meter of air. On March 17, 1983, Allied placed monitors on employees at the landfill and obtained readings of two micrograms per cubic meter. These readings are a time weighted average concentration for an eight hour period. The significance of the measurements lies in their relationship to a threshold limit

---

11. "Chrome" in this opinion means hexavalent chrome. The laboratory tests at times found traces of trivalent chromium, the highest concentration of which was nine parts per million. By its own specifications QC would accept up to twenty parts per million of trivalent chromium in ferrous sulfate which it purchased.

value (TLV). The occupational TLV in theory represents the highest concentration of a pollutant to which nearly all workers may be repeatedly exposed, for an eight hour work day and a forty hour work week, over a working lifetime, without adverse effect.

The TLV for chrome under the Maryland Occupational Safety and Health Act (MOSH) is fifty micrograms. Under the federal Occupational Safety and Health Act, the TLV is one hundred micrograms. The American Conference of Governmental and Industrial Hygienists has recommended fifty micrograms as the TLV for chrome. The National Institute of Occupational Safety and Health (NIOSH), the research arm of the Federal Occupational Safety and Health Administration (OSHA), had recommended one microgram to OSHA, but OSHA rejected that recommendation. QC's expert witness, a toxicologist and professor emeritus of chemistry, using the NIOSH recommendation of one microgram and the readings at Hawkins Point of two micrograms, opined that the air at QC's property was hazardous to health.

The Air Management Administration of the Maryland Department of Health and Mental Hygiene, beginning in October 1982, has been conducting an air quality monitoring program at the Hawkins Point landfill using three monitors. Two are located near Thoms Cove, and the third is located on the far side of the Baltimore Beltway from the landfill. These monitors take twenty-four hour samples once every two to three days. The results of this monitoring program are expressed as an annual average and are compared to a TLV which in theory represents the concentration to which nearly all persons could be exposed for twenty-four hours a day, 365 days a year, without adverse effect. The TLV for this program is .12 microgram of *total* chromium per cubic meter. At many times the total chromium levels at Hawkins Point were so low that the monitors were unable to detect any at all and, when readings were obtained, they ranged from .008 to .011 microgram. Because these readings are for total chromium, the amount of hexavalent

chromium would be less. The readings obtained at Hawkins Point are very similar to the levels of total chromium measured at other Baltimore area monitors located in Essex, at the Fire Department Headquarters in downtown Baltimore, and in Canton, on the opposite side of the Baltimore harbor from Hawkins Point.

Any legal sufficiency of QC's taking claim necessarily rests on the opinion of its expert which is, in turn, based on the NIOSH recommended TLV of one microgram for an eight hour weighted average in the workplace. But a taking in the constitutional sense requires a high degree of interference with the use of property. In this case the legally controlling TLV for chrome in the air at a workplace is fifty micrograms as established under MOSH.[12] It is therefore immaterial that a jury might view the NIOSH standard as the more desirable one or view the opinion of plaintiff's expert as the more persuasive one. No MOSH violation arises from QC's workers being exposed to the very low levels of chrome detected at QC's premises. QC was not legally prevented from employing persons at the Hawkins Point site and there is no evidence that either QC or M.E.S. has been unable to obtain or retain employees there. QC has not shown that chrome in the air prevents or substantially impedes it from doing business.

In work-a-day, human terms the air quality evidence means that drivers who truck the chromium ore tailings to the disposal site and dump it, and the M.E.S. employees who bulldoze the material, are not required to wear respirators. Truck drivers must wear respirators only after the load has

---

**12.** The federal Occupational Safety and Health Act of 1970 permits a state to assert jurisdiction over an occupational safety and health issue where no standard is in effect under federal law. Additionally, a state may reassume responsibility for an occupational safety and health issue where federal standards are promulgated if the state plan meets a series of requirements designed to assure that the state plan will be as effective as the federal program. 29 U.S.C. § 667. Brown, *State Plans Under the Occupational Safety and Health Act of 1970,* 38 Law & Contemp.Probs. 745 (1974). *See also J.I. Hass Co. v. Department of Licensing & Regulation,* 275 Md. 321, 327, 340 A.2d 255, 258–59 (1975).

been dumped, when the driver must place himself between the open tailgate and the edge of the raised truck body in order to sweep out of the truck body any remnants of the waste material. There was evidence that one of the remaining QC employees chose to wear a respirator out of doors on the QC site in the summer of 1983. There was no evidence that using a respirator out of doors was required by any occupational safety regulation. That respirator had been issued to him because of exposure to dust while drying ferrous sulfate inside of the QC plant.

Assuming that, under *Causby*, a takings analysis considers the degree of interference with a particular business conducted on the alleged condemnee's premises, we hold as a matter of law that there is no evidence of interference in this case on the order of magnitude of a taking.

JUDGMENT OF THE COURT OF SPECIAL APPEALS ON THE INVERSE CONDEMNATION CLAIM ASSERTED IN COUNT III OF THE COMPLAINT IS REVERSED. IN ALL OTHER RESPECTS THE JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY QC CORPORATION.

McAULIFFE, Judge.

The short answer to the principal question considered in this case is "yes"—a property owner may recover compensation from the State for inverse condemnation where nonregulatory action causes interference with use of property that is less than deprivation of all beneficial use. A further answer is that the interference, if any, shown by the evidence here is insufficient as a matter of law to amount to a "taking" in the constitutional sense.

The preeminent problem inherent in an inverse condemnation claim of this type is the determination of the point at which the nature and extent of governmental interference with the use of private property becomes unacceptable in the absence of compensation. The Constitution requires compensation for interference that exceeds a tolerable level,

whether resulting from the governmental exercise of regulatory power or other government activity. This tolerable level, or the point beyond which the property owner can no longer be asked to shoulder a burden for the common welfare, is not static. Its placement on the spectrum of deprivation may vary according to the type of governmental authority being exercised, i.e. whether regulatory or non-regulatory, and perhaps as well according to the nature and importance of the public good that is served.

A land-use regulation that does not substantially advance legitimate state interests or that denies an owner "economically viable" use of his land constitutes a taking. *Nollan v. California Coastal Com'n,* —— U.S. ——, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). The level of interference of use at which non-regulatory governmental action will constitute a taking will sometimes be less, as where there is a permanent physical occupation of part of the land or improvements. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). As I see it, we leave open the question of whether a somewhat more amorphous and diffuse physical invasion of the property[1] resulting from non-regulatory governmental activity may constitute a taking without mounting up to a denial of the economically

---

**1.** I cannot agree with the majority's conclusion that this case does not involve a physical invasion of QC's property by the State. The State operates its hazardous waste disposal facility so as to routinely cause a known carcinogen to be present in the air space proximate to, and deposited on, the surface of QC's property. For purposes of assessing interference of use, I believe the air space normally occupied by persons involved in ordinary or dedicated use of the land should be considered a part of the property. Surely, if the State's operations routinely placed *two thousand* micrograms of hexavelent chromium in each cubic foot of QC's normally occupied air space there would be a physical invasion of property that would amount to a taking and require the payment of just compensation. The question is not whether there has been a physical invasion, but the extent of that invasion.

viable use of the land—we hold only that assuming a lower level of interference would suffice to constitute a taking under the circumstances of this case, the evidence is clearly insufficient to cross even that threshold.